IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

No. 24-3887
No. 25-3017
(consolidated)

_____


UNITED STATES OF AMERICA,

Appellee,

v.

ANITA GREEN,

Appellant.

_____

Direct appeal from a sentence and restitution order
in the Northern District of Ohio

_____

BRIEF OF APPELLANT

_____

Amy Lee Copeland
Georgia Bar No. 186730
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000

Attorney for Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES .......................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................. vii

JURISDICTIONAL STATEMENT .................................................. 1

STATEMENT OF THE ISSUES ...................................................... 2

STATEMENT OF THE FACTS ....................................................... 3

SUMMARY OF THE ARGUMENT ............................................... 15

ARGUMENT AND CITATION OF AUTHORITY ........................ 18

     APPEAL NUMBER 24-3887 ................................................. 18

     Did the district court err when it denied Green a reduction for
     acceptance of responsibility based on statements she made pre-
     indictment and by mistakenly attributing Green's clarification at
     the plea colloquy that she knew that a controlled substance was
     involved "after the fact" to the entirety of relevant
     conduct? ................................................................................. 18

     Standard of review ............................................................... 18

     Argument ............................................................................... 20

        a. The "syringes" concern reflects to pre-indictment conduct,
           which is outside the scope of the acceptance of responsibility
           determination. ............................................................. 24

b. Acceptance looks to a party's conduct after her guilty plea, but even if the Court considers Green's questions about "knowingly" at that colloquy, it supports the grant of acceptance here. .......................................................... 27

c. The §3E1.1 factors support an acceptance reduction.. 33

APPEAL NUMBER 25-3017 .................................................. 18

Where the statute permits the award of the expenses of necessary psychological care "in the case of an offense resulting in bodily injury to a victim," did the district court err in awarding restitution for past and future mental health treatment to victims who did not suffer bodily injury? ......................................... 38

Standard of review ................................................................. 38

Argument ................................................................................. 39

CONCLUSION .................................................................................. 50

CERTIFICATE OF COMPLIANCE .............................................. 51

CERTIFICATE OF SERVICE ........................................................ 52

DESIGNATION OF RELEVANT DISTRICT COURT

DOCUMENTS .................................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*Burgess v. United States*, 553 U.S. 124 (2008) ................................. 48-49

*Dolan v. United States*, 560 U.S. 605 (2010) ........................................... 2

*Dotson*, 242 F.3d 391 (Table), 2000 WL 1820375 (10th Cir. Dec. 12, 2000)

............................................................................................... 46

*Hasler v. United States*, 718 F.2d 202 (6th Cir. 1983) ....................... 19, 49

*Moore v. Harris*, 623 F.2d 908 (4th Cir. 1980) ....................................... 49

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ...................................... 39

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ........................... 20

*United States v. Al-Maliki*, 787 F.3d 784 (6th Cir. 2015) ....................... 46

*United States v. Bedford*, 914 F.3d 422 (6th Cir. 2019) ........................... 41

*United States v. Breshers*, 684 F.3d 699 (7th Cir. 2012) .................... 46-47

*United States v. Church*, 731 F.3d 530 (6th Cir. 2013) ........................... 38

*United States v. Dayea*, 73 F.3d 229 (9th Cir. 1995) ......................... 44-45

*United States v. Dotson*, 242 F.3d 391, 2000 WL 1820375 (Table)(10th

Cir. 2000) ..................................................................................... 46-47

*United States v. Evers*, 669 F.3d 645 (6th Cir. 2012) ......................... 38-39

*United States v. Hakley*, 101 Fed. Appx. 122 (6th Cir. 2004) ................ 26

*United States v. Hicks*, 997 F.2d 594 (9th Cir. 1993) .............................. 45

*United States v. Jeter*, 191 F.3d 637 (6th Cir. 1999), *abrogated on other grounds, Buford v. United States*, 532 U.S. 59 (2001) ................... 24-26

*United States v. Merritt*, 102 F.4th 375, 378-79 (6th Cir. 2024) .............. 19

*United States v. Olano*, 507 U.S. 725 (1993) ......................................... 20

*United States v. Patton*, 651 Fed. Appx. 423 (6th Cir. 2016) .................. 43

*United States v. Powell*, 42 Fed. Appx. 565 (4th Cir. 2002) .................... 45

*United States v. Prater*, No. 22-5599, 2024 WL 3634526 (6th Cir. Aug. 2, 2024) ............................................................................................ 18-19

*United States v. Reichow*, 416 F.3d 802 (8th Cir. 2005) .......................... 44

*United States v. Rivera-Solis*, 2024 WL 2044744 (D.P.R. May 8, 2024) 43

*United States v. Rodgers*, 2789 F.3d 599 (6th Cir. 2002) ................... 26-27

*United States v. Sharp*, 927 F.2d 170 (4th Cir. 1991) .............................. 45

*United States v. Tilford*, 224 F.3d 865 (6th Cir. 2000)*, abrogated on other grounds, Buford v. United States*, 532 U.S. 59 (2001) ................... 26-27

*United States v. United States Gypsum Co.,* 333 U.S. 364 (1948) ......... 19

*United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007) .......................... 44

## Statutes

18 U.S.C. §3 ............................................................................ 1, 6, 40, 42

18 U.S.C. §831(f)(5) ....................................................................... 48

18 U.S.C. §1365(g)(4) ..................................................................... 48

18 U.S.C. §1515(a)(5) ..................................................................... 48

18 U.S.C. §1864(d)(2) ..................................................................... 48

18 U.S.C. §3231 ............................................................................... 2

18 U.S.C. §3663(a)(1)(A) ........................................................... 40-41

18 U.S.C. §3663(b)(2)(A) ........................................................ 40-42, 47

18 U.S.C. §3663(b)(2)(C) ................................................................ 43

18 U.S.C. §3663A ...................................................................... 1, 40

18 U.S.C. §3663A(b)(2)(A) ............................................................. 40

18 U.S.C. §3663A(b)(2)(C) ............................................................. 43

18 U.S.C. §3663A(c)(1) ................................................................. 40

18 U.S.C. §3663A(c)(2) ................................................................. 40

18 U.S.C. §3664(o) ......................................................................... 2

18 U.S.C. §3742(a) ......................................................................... 2

## Other Authorities

Black's Law Dictionary (12th ed. 2024) ...................................................... 40

Fed. R. App. P. 4(b)(1)(A)(i) ................................................................ 1, 2

Fed. R. App. P. 32(a)(5) .......................................................................... 51

Fed. R. App. P. 32(a)(6) .......................................................................... 51

Fed. R. App. P. 32(a)(7)(B)(i) ................................................................ 51

Fed. R. App. P. 32(f) .............................................................................. 51

Fed. R. Crim. P. 11 ................................................................................ 28

Meriam Webster Online Dictionary ........................................................ 40

U.S.S.G. §1B1.3 ..................................................................................... 21

U.S.S.G. §3E1.1, comment. (n. 1(A)) ................................................. 21, 36

U.S.S.G. §3E1.1, comment. (n. 1(C)) ..................................................... 21

U.S.S.G. §3E1.1, comment. (n. 1(G)) ..................................................... 21

U.S.S.G. §3E1.1, comment. (n. 1(H)) .................................................. 21, 37

U.S.S.G. §3E1.1, comment. (n. 3) ........................................................... 36

U.S.S.G. §3E1.1(a) ............................................................................. 20-21

U.S.S.G. §3E1.1(b) .................................................................................. 20

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Anita Green requests oral argument in these consolidated appeals. Green believes that argument would be helpful to discuss the appropriate standard of review for acceptance of responsibility determinations, what information the district court may rely upon in those determinations, and whether the plain language of the restitution statute bars the requested restitution in this case. While Green believes that her brief adequately presents the facts and legal arguments in the case, she also believes that the decisional process would be significantly aided by oral argument.

# JURISDICTIONAL STATEMENT

A federal grand jury returned an indictment charging Appellant Anita Green with a single count of accessory after the fact in violation of 18 U.S.C. §3. (Indictment, R11 at 5, Page ID#89) Green pleaded guilty to that charge without a plea agreement. (TR 10/17/23, R66 at 45, Page ID#630) By written judgment entered on October 3, 2024, the district court sentenced Green to 121 months' imprisonment. (Judgment, R138 at 2, Page ID#3164) Green filed a notice of appeal on October 9, 2024. (Notice of Appeal, R144, Page ID#3214) This filing was timely under Fed. R. App. P. 4(b)(1)(A)(i) since it was made within 14 days of the judgment. This notice of appeal forms the basis for appeal number 24-3887.

On December 27, 2024, the district court entered an amended judgment imposing an order of restitution. (Restitution Order, R161, Page ID#3485-3490; Amended Judgment, R162, Page ID#3491-3496) Green filed a notice of appeal from the amended judgment on January 10, 2025. (Notice of Appeal, R164, Page ID#3716) This filing was timely under Fed. R. App. P. 4(b)(1)(A)(i) since it was made within 14 days of

the judgment. This notice of appeal forms the basis for appeal number 25-3017.

Since the charged offenses violated the laws of the United States, the district court had jurisdiction under 18 U.S.C. §3231. In appeal number 24-3887, the October 3, 2024, judgment and commitment order is a final order, meaning that this Court has jurisdiction over this appeal under 28 U.S.C. §1291 and 18 U.S.C. §3742(a). In appeal number 25-3017, a sentence that imposes an order of restitution is also a final judgment under 18 U.S.C. §3664(o), meaning that this Court has jurisdiction under 28 U.S.C. §1291. *See generally Dolan v. United States*, 560 U.S. 605, 617-18 (2010).

## STATEMENT OF THE ISSUES

On January 30, 2025, the Court consolidated for purposes of briefing and submission Green's appeals from her sentence and from the later imposition of restitution. The sentencing appeal (number 24-3887) presents this issue:

> Did the district court err when it denied Green a reduction for acceptance of responsibility based on statements she made pre-indictment and by mistakenly attributing Green's clarification at the plea colloquy that she knew that a controlled substance was involved "after the fact" to the entirety of relevant conduct?

The restitution appeal (number 25-3017) presents this issue:

Where the restitution statute permits the award of the expenses of necessary psychological care "in the case of an offense resulting in bodily injury to a victim," did the district court err in awarding restitution for past and future mental health treatment to victims who did not suffer bodily injury?

## STATEMENT OF THE FACTS

This case arises from the death of T.H., Green's former son-in-law, at the hands of his ex-wife, Green's daughter. This appeal raises questions of acceptance of responsibility and the propriety of restitution for psychological counseling for T.H.'s minor daughters, Green's own granddaughters. A recitation of facts follows, although to avoid undue repetition, Green reserves some of the facts for the argument section.

Green is the mother of Amanda Hovenac. (Presentence Investigation Report ("PSR") at 9-10, ¶43)(Sealed)[1] Amanda had been married to T.H., a State Department employee, and lived with T.H. and their three children when he was stationed in South Africa, where she became romantically involved with Anthony Theodorou. (*Id.* at 4, ¶6) Theodorou and Amanda continued their relationship when Amanda

---

[1] Counsel did not receive a copy of the PSR with Page ID identifiers. She cites to the PSR by .pdf page number and paragraph.

returned to the United States, and Amanda filed for divorce from T.H. in April 2021. (TR 10/1/24, R160 at 34-35, Page ID#3291-92)

Around that time, Amanda called Theodorou and said that she wanted to kill T.H. (*Id.*) According to Theodorou, he tried to enlist a succession of hitmen to do so, and one of them eventually agreed to secure M99, or etorphine, an animal tranquilizer lethal to humans. (*Id.* at 34-44, Page ID#3291-3301) Theodorou sent a small vial of etorphine, a liquid, from South Africa to Amanda in Ohio via common carrier to Amanda at the home she shared with her mother. (*Id.* at 45-47, Page ID#3302-04) The carrier's delivery label shows delivery on February 23, 2022. (*Id.* at 46-47, Page ID#3303-04) Theodorou flew from South Africa to Ohio; left Ohio from April 4 to April 21, 2022; and returned to Ohio on April 21, 2022, to stay with Amanda at her mother's home in Wapakoneta. (*Id.* at 50-52, Page ID#3307-09) Theodorou's return trip on April 21 was the first interaction he had with Green. (*Id.*)

On April 22, 2022, Amanda and T.H. had a child custody hearing about their three minor daughters; T.H., who had returned to Ohio for the hearing, received visitation with his girls until 7 p.m. on April 24, 2022. (PSR at 5, ¶8) Amanda came home upset. (TR 10/1/24, R160 at

52-53, Page ID#3309-10) That night at the dinner table, Amanda told T.H., one of her sisters, and Green that she intended to kill T.H. (*Id*. at 54-55, Page ID#3311-12) When asked on cross about whether any discussion of planning the killing occurred, Theodorou replied, "There was points that *a poison* would be utilized." (*Id*. at 93, Page ID#3350)(emphasis added)[2]

Again, T.H. had to return his three daughters to Amanda by 7 p.m. on Sunday, April 24, 2022. Green and Amanda waited for the children to return at the end of the driveway next to the garage, and when the girls arrived, Green ushered them into the house as Amanda promised her children "a surprise." (PSR at 5, ¶11) While T.H. removed booster seats in the car, Amanda killed T.H. by plunging a syringe filled with etorphine into his neck. (*Id*. at 5, ¶12) T.H.'s car had a dash camera in the front windshield that faced forward and audio recording capabilities. (*Id*. at 5, ¶10) The camera captured T.H.'s last comments

---

[2] Theodorou gave additional testimony about discussions heard by Green and actions she took between Friday, April 22 and T.H.'s death on Sunday, April 24. Green will discuss that testimony in the argument section.

and Amanda's removing T.H.'s phone from his hand as he tries to call for help. (*Id.* at 5, ¶12)

T.H.'s death remained undetected until April 27, 2022. (*Id.* at 5, ¶7) It was a short trail back to Amanda, Theodorou, and Green. Indeed, investigators spoke with Green on April 27 and April 28, 2022, and by her own admission, she lied to them. (TR 10/1/24, R160 at 141-43, Page ID#3398-3400)[3]

On May 25, 2022, the government filed a six-count indictment against Amanda, Theodorou, and Green. (Indictment, R11, Page ID#85) The first five counts charged Amanda and Theodorou with crimes related to the importation of Etophine, the animal tranquilizer and Schedule II controlled substance, that Amanda used to kill T.H. (*Id.* at 1-4, Page ID#85-88) The indictment named Green in the final count and charged her with accessory after the fact, in violation of 18 U.S.C. §3. (*Id.* at 5, Page ID#89)

The charge against Green alleged in its entirety that

On or about April 24, 2022 and continuing through April 28, 2022, in the Northern District of Ohio, Western Division, Defendant ANITA GREEN, knowing that Amanda Hovanec and Anthony

---

[3] As will be discussed in the argument section, the government relied extensively at sentencing on these pre-indictment statements by Green.

Theodorou had caused the death of T.H. by means of distribution of a controlled substance, did receive, relieve, comfort and assist Hovanec and Theodorou in order to hinder and prevent their apprehension, trial and punishment, in violation of Title 18, United States Code, Section 3.

(*Id.*)

Green proffered on September 1, 2022, and pleaded guilty without a plea agreement on October 17, 2023. (TR 10/17/23, R66 at 1, Page ID#586; TR 10/1/24, R140 at 140, Page ID#3397) At her proffer, Green admitted that Amanda told her before T.H. arrived that she (Amanda) had to "something." (TR 10/1/24, R160 at 140, Page ID#3397) And Green used the word "poison" – the same word that Theodorou used to describe what Amanda said to her mother and a sister at a dinner conversation on August 22:

Q. . . . And was there any planning of the killing during that conversation? Actual details of how it was to be carried out and –

A. There was points that a poison would be utilized.

(*Id.* at 93, Page ID#3350)[4] The use of the word "poison" is instrumental to understanding a question Green asked at the plea colloquy.

---

[4] Amanda herself used the word "poison" with investigators in a pre-indictment interview. (PSR at 6, ¶14)("Though [Amanda] did not know what she injected into T.H., she referred to it as a 'poison' or a 'drug'. . . .")

Green, who had never been in criminal trouble previously, was

very nervous at the plea colloquy.[5] (TR 10/17/23, R66 at 24, Page

ID#609) There, the district court told Green that the government would

offer a factual basis, after which the court would ask questions about

whether the government was "right that they could prove that" and "did

you do that." (*Id.* at 33-34, Page ID#618-19) Here is the factual basis

given by the government:

> . . . On or about April 24th, 2022, Amanda Hovanec and Anthony
> Theodorou did *knowingly* and intentionally distribute a controlled
> substance to T.H. that resulted in T.H.'s death. The defendant,
> Anita Green, knew that Amanda Hovanec and Anthony
> Theodorou had committed this crime and thereafter took steps to
> help them avoid being arrested, prosecuted or punished.
>
> Specifically, after this crime had been committed, the defendant
> drove Amanda Hovanec, Anthony Theodorou and T.H.'s dead body
> to a location where Amanda and Anthony buried T.H.'s body.

---

[5] Given the importance of the colloquy to the district court's rejection of
an acceptance reduction, Green recites the plea colloquy in some detail.

As will be distilled in the argument section and italicized here, the key
point of this colloquy is that Green asked for clarification of the word
"knowingly," which the government used only with respect to the
controlled substance allegation. Green's initial answer and her answer a
few pages later indicates that her "after the fact" response went to her
knowledge that her daughter used a controlled substance. Even
Theodorou testified that Amanda described it to Green as "poison."

Subsequent to the burial, the defendant returned to the location to pick up Amanda and Anthony and return them to her home where the crime had been committed.

In the days that followed, the defendant engaged in several conversations with law enforcement that were designed to thwart law enforcement's efforts to locate T.H. and cover up the crimes that had been committed.

In her post-arrest statements, the defendant admitted that she had committed these acts with the intention of protecting Amanda Hovanec and preventing her arrest and prosecution . . . .

(*Id.* at 34-35, Page ID#619-20)(emphasis added)

When the court asked Green, "Is she right?," Green conferred with her attorney. (*Id.* at 35, Page ID#620) Green responded, "The charges are correct." (*Id.*) This exchange ensued:

THE COURT: Well, did you do what [the prosecutor] says you did?

THE DEFENDANT: The "knowingly."

THE COURT: Say it again.

THE DEFENDANT: *I said that I'm questioning the "knowingly," like, that there was – I forget how you started.*

THE COURT: *Well, what part of what she said – what are you quibbling with about "knowingly"? What are you saying you didn't know?*

THE DEFENDANT: *I don't know what they did.*

THE COURT: *Well, the elements of the offense are that you knew. . . that they killed T.H.; correct?*

*THE DEFENDANT: Yes, after the fact, I knew that.*

THE COURT: Okay. And you helped them not get arrested. You gave false information to the police, and you did other things to help them avoid being caught.

Would that be true?

THE DEFENDANT: That is.

(*Id.* at 35-36, Page ID#620-21)(emphasis added) Green admitted that she did this "[t]o help [her] daughter . . . who [she] knew . . . had killed T.H." by helping her "avoid being arrested and prosecuted and punished for doing that. . . ." (*Id.* at 37, Page ID#622)

The government asked for a break and "the opportunity to speak to [defense counsel] for a few moments." (*Id.* at 38, Page ID#623) After the attorneys conferred, defense counsel asked for some time to speak to Green. (*Id.* at 38-39, Page ID#623-24) When defense counsel returned, he asked for – and got – permission to tell a "very, very brief story" to explain "exactly what's going on here." (*Id.* at 39-40, Page ID#624-25) The story involved his wife's receiving a speeding ticket, going to court with him to resolve it, and asking after the fact, "What just happened in there." (*Id.* at 40, Page ID#625)

Defense counsel got "the same feeling when speaking with Ms. Green . . . ." (*Id.*) He elaborated:

> . . . [I]t's much different sitting there and hearing the recitation of facts than it is for the three counsel, Your Honor and everyone who has been in here who do this every day. And so terms like "knowingly" and the definitions and so forth are being blurred together because there's – without getting into it until the time of sentencing, there is a fact pattern that is agreed to, and there is a fact pattern that is not. . . .

(*Id.*) Defense counsel described how "[i]t sounded different coming through the elements of the offense, jury instructions and conversations versus the way I talked about it." (*Id.* at 41, Page ID#626). He, too, noted Green's "fear that what we had talked about for so long before this, that that was changing before her eyes," but it was not. (*Id.*)

After consulting the government about how it wished to proceed, the district court asked Green again about the offense's elements. (*Id.* at 42, Page ID#627) Green stated that she knew that her daughter and her friend killed T.H. in the driveway. (*Id.*) *The district court asked, "All right. And they did it with some kind of drug that they imported. You knew that also, correct?"* (*Id.*)(emphasis added) *Green replied, "After the fact, yes."* (*Id.*)(emphasis added) The district court then asked Green if she tried to help her daughter avoid arrest, prosecution, and

punishment by "helping get rid of T.H.'s car or taking them somewhere to bury the body" and by giving law enforcement "false information." (*Id*. at 42-43, Page ID#627-28) Green agreed. (*Id*. at 43, Page ID#628)

The government indicated that it was "satisfied." (*Id*.) When given the opportunity to correct or add to the colloquy, the government indictment that the court "set them out as needed," that Green "understands them" and "accepted them," and that the government was "comfortable" with the plea. (*Id*. at 44, Page ID#629) Green then pleaded guilty, which the district court accepted. (*Id*. at 44-45, Page ID#629-30)

Green submitted an acceptance of responsibility statement, which the probation officer found adequate to warrant an acceptance reduction. (PSR at 5-6, 8, ¶¶7-17, 29-30) With acceptance, Green faced an advisory range of 70-87 months. (PSR at 12, ¶54) The government did not object to his recommendation, at least not initially.

The district court held Green's sentencing hearing on October 1, 2024. (TR 10/1/24, R160 at 1, Page ID#3258) On September 23, 2024, the government filed a supplemental sentencing memorandum "to note the government's objection to any reduction in Green's offense level for

acceptance of responsibility." (Govt's Supp. Sent'g Mem., R125 at 1, Page ID#2489)(Sealed) The government cited "newly discovered information from defendant Anthony Theodorou"—i.e., a February 6, 2024, interview – and "confirmation of that newly discovered information by Amanda Hovanec. . . ." (*Id.*) As will be discussed in the argument section, Theodorou and an FBI agent testified at the sentencing hearing about, respectively, conversations with and actions by Green from April 22 until T.H.'s death on April 24 and preindictment statements and a post-indictment proffer made by Green.

The district court did not award an acceptance of responsibility reduction to Green. As will be discussed in the argument section, the district court based its determination on Green's preindictment statements to investigators and Green's question about "knowingly" and clarification about "after the fact" at the plea colloquy. (TR 10/1/24, R160 at 188-90, Page ID#3445-47) With the denial of acceptance, Green faced an advisory range of 97 to 121 months. (*Id.* at 190, Page ID#3447) She received 121 months. (Judgment, R138 at 2, Page ID#3164)

The district court deferred the issue of restitution at sentencing. (TR 10/1/24, R160 at 218, Page ID#3475) The government sought

restitution for "psychological harm to the Minor Victims" – i.e., T.H.'s three young daughters – "directly traceable to . . . Green's own actions." (Restitution Br., R106 at 7, Page ID#1511) In dollar terms, the government sought $126,000 for psychological counseling costs for the minors, payable jointly and severally by the three defendants in this case. (*Id*. at 17, Page ID#1521) Green responded in part the minors did not suffer bodily injury, making them statutorily ineligible for restitution. (Def.'s Br. in Opposition, R151 at 2-3, Page ID#3232-33)

The district court awarded restitution for psychological counseling, finding that "the term 'bodily injury' can be read to encompass psychological injury" and ordered Green to pay $126,000 in restitution, jointly and severally with her co-defendants. (Restitution Order, R161 at 3, 6, Page ID#3487, 3490; Amended Judgment, R162, Page ID#3490-96)

Green's timely appeals from the judgment and amended judgment have led to this consolidated appeal.

## SUMMARY OF THE ARGUMENT

The district court erred when it denied an acceptance of responsibility reduction to Green. Although the government initially had no objection to this reduction, it changed its stance shortly before the sentencing hearing based on a proffer by Theodorou and a revised acceptance of responsibility statement submitted by Amanda. Using a combination of Green's pre-indictment statements to law enforcement and a truncated version of Green's plea colloquy, the government argued that Green falsely denied relevant conduct. The district court agreed, expressing concern about the pre-indictment statements and Green's questions about the use of the word "knowingly" during the plea colloquy.

This determination was error. The relevant period for acceptance determinations is the period following the defendant's entry of her guilty plea. Here, the district court relied on statements made prior to Green's indictment to deny her an acceptance reduction. This error was coupled with a misunderstanding about a clarification Green made at her plea colloquy. At the outset the factual basis, the government represented that Amanda and Theodorou "knowingly" distributed a

controlled substance to T.H. that resulted in his death. Green asked for clarification about "knowingly" with respected to how the prosecutor "started," and Green said she knew "after the fact."

Shortly after, this exchange occurred:

THE COURT: All right. And they [Amanda and Theodorou] did it with some kind of drug that they imported.

You knew that also, correct?

DEFENDANT: *After the fact.*

The entire plea transcript shows that Green's reference to "after the fact" meant that she knew that Amanda and Theodorou used a controlled substance or drug "after the fact" to kill T.H. Even by Theodorou's reckoning, Amanda told her mother that she had "poison."

When viewed in light of the entire colloquy, Green's use of "after the fact" referred only to the use of a controlled substance, not to whether she knew anything prior to the T.H.'s murder. In fact, Green's post-indictment proffer demonstrated that she knew that Amanda intended to do "something" with "poison." Based on a misunderstanding about what Green meant by "after the fact," the district court found that she falsely denied relevant conduct.

Green also challenges the restitution award of $126,000 for psychological counseling to benefit T.H.'s three minor children, her own grandchildren. The relevant statute, without further definition, provides restitution for a victim who has suffered "bodily injury." The plain meaning of that term is an injury to the body. Only a victim who suffers bodily injury may receive a restitution award for psychological counseling. The minor victims awarded restitution suffered no bodily injury, so the statute does not allow restitution to them, which is consonant with the rulings of the circuits that have considered the issue.

## ARGUMENT AND CITATION OF AUTHORITY

In appeal 24-3887, Green challenges the denial of the reduction for acceptance of responsibility. In appeal 25-3017, Green challenges the award of restitution for psychological counseling to victims who suffered no bodily injury. She addresses each in turn.

### APPEAL NUMBER 24-3887

**Did the district court err when it denied Green a reduction for acceptance of responsibility based on statements she made pre-indictment and by mistakenly attributing Green's clarification at the plea colloquy that she knew that a controlled substance was involved "after the fact" to the entirety of relevant conduct?**

Green first challenges the district court's denial of an acceptance of responsibility reduction.

### Standard of review

The appropriate standard of review is not entirely clear. In a recent unreported opinion, the Court indicated that it reviews a district court's fact findings for clear error, although it "has not settled on the proper standard of review for a district court's application of its factual finding" for either the acceptance of responsibility or obstruction of justice guideline. *United States v. Prater*, No. 22-5599, 2024 WL

3634526 at *6 (6th Cir. Aug. 2, 2024). It did not resolve the issue in that case.

In a case involving the interplay of the acceptance and obstruction guidelines, the Court noted that it "employed an exacting standard to determine whether a defendant has accepted responsibility after having obstructed justice." *United States v. Merritt*, 102 F.4th 375, 378-79 (6th Cir. 2024). Thus, the Court "review[s] the question of whether a defendant has demonstrated that [s]he accepted responsibility for clear error, a standard that reflects the great deference [an appellate court] grant[s] the district court's decision on this factual matter." *Id.* at 380-81. This standard represents a "pivot[]" from *de novo* review. *Id.* at 379.

Clear error occurs when there is evidence to support a finding, but "the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been committed." *Hasler v. United States*, 718 F.2d 202, 204 (6th Cir. 1983), *citing United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948).

To the extent Green raises a matter for the first time on appeal, the Court reviews it for plain error. Plain error review involves a familiar four-part test: 1) error 2) that is plain (i.e., clear and obvious

under the law), 3) that affects substantial rights, and 4) that affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732-36 (1993); *see generally* Fed. R. Crim. P. 52(b). "In the ordinary case. . . the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018).

## Argument

The guidelines allow a reduction of three levels for acceptance of responsibility. *See* U.S.S.G. §3E1.1(a)(two levels for "clearly demonstrate[d] acceptance of responsibility); U.S.S.G. §3E1.1(b) (allowing for additional level of government's motion if acceptance, usually by guilty plea, relieves government of "substantive preparations" for trial). A defendant who pleads guilty does not automatically receive an acceptance reduction. *See* U.S.S.G. §3E1.1, comment. (n. 3). District courts must consider several factors.

Most relevant here is how a defendant must approach both offense conduct and relevant conduct to receive an acceptance reduction. An "appropriate consideration[]" includes a defendant's

truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 . . . Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct without affecting [her] ability to obtain a reduction under this subsection. A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous.

U.S.S.G. §3E1.1, comment. (n. 1(A)). Other considerations include "voluntary payment of restitution prior to adjudication of guilt," "post-offense rehabilitative efforts," and the timeliness of a defendant's acceptance. *Id.* at comment. (n. 1(C), (G), (H)).

A defendant's guilty plea "combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which [s]he is accountable under §1B1.3 . . . will constitute significant evidence of acceptance of responsibility" for §3E1.1(a). *Id.* But "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.*

The PSR recommended that Green receive a reduction for acceptance of responsibility, with which the government initially agreed. (PSR at 7-8, 18) Eight days before sentencing, the government filed a supplemental sentencing memorandum stating its objection for the first time. (Govt's Supp. Sent'g Mem., R125 at 1, Page ID#2489) As justification, the government cited Green's preindictment statements to authorities, Theodorou's proffer, Amanda's changed acceptance of responsibility statement, Green's "attempt to rewrite the facts, as evidence in her sentencing memorandum," and her attempted proffer in August 2022. (*Id*. at 4, Page ID#2492) The government characterized Green as being "dishonest" in her change of plea hearing, too. (*Id*. at 4-5, Page ID#2492-93)

At the sentencing hearing, the government relied on Theodorou's statements concerning Green's knowledge before T.H.'s murder and her statements to law enforcement (TR 10/1/24 at 52-76, Page ID#3309-34) and Agent Eilerman's extensive description of Green's pre-indictment statements and a cursory description of her post-indictment proffer (*Id*. at 132-142, Page ID#3389-99). The government argued these points, as

well as contending that Green lied to the court in her change of plea.
(*Id*. at 165-192, Page ID#3422-3449)

The district court found Theodorou credible. (*Id*. at 188, Page ID#3445) In denying Green acceptance of responsibility, here is what he said about her:

> . . . I found words coming out of Ms. Green's own mouth during the recorded interview about knowing about poison and not syringes and then syringes.
>
> So it's inescapable for me to conclude, in hindsight, looking backwards, as I must, judging on what I have seen and heard, that she did, in fact, know that this plan was afoot, and by driving them out to dig the grave the day before the murder, I'm very troubled by her parsing the word "knowingly" and making a big deal about after the fact at the time of her change of plea. I don't believe I've ever not granted acceptance of responsibility before, but I don't believe I've ever seen somebody caught parsing relevant conduct like this the way that she did. I mean, I, frankly, think there's room that she could well, in hindsight, have been included as a potential co-conspirator here. That's how I see it looking backwards today.
>
> *****
>
> So I find that she did mislead, or let's say lie or not be candid at the time of her acceptance of the factual basis for the plea. And she was – she was too clever by one-third at that time in going back there, and this might have all just blown by, but she very carefully took apart the word "knowingly" because I suspect it somehow was throwing her under the bus or something, but . . . I'm going to . . . sustain the government's objection to the acceptance of responsibility in this case and not include those three points reduction in the calculation . . . .

I believe she was substantially more involved than I was led to believe at the time of her plea. . . .

(*Id.* at 188-90, Page ID#3445-47) The district court's concerns were three-fold: Green's discussion of "syringes," her question at the plea colloquy (which ties into its "poison" concerns), and the district court's belief that Green was more involved than the court believed at the plea.

### a. The "syringes" concern reflects to pre-indictment conduct, which is outside the scope of the acceptance of responsibility determination.

The comments about syringes occurred in a pre-indictment interview. (*Id.* at 137-38, Page ID#3394-95; TR of 4/28/22 Interview, R104-7 at 10, 21-22, 27, Page ID#1480, 1491-92, 1498) The calculus of whether a defendant accepts responsibility does not begin at Green's pre-arrest, pre-indictment conduct.

In *United States v. Jeter*, 191 F.3d 637, 639 (6th Cir. 1999), *abrogated on other grounds, Buford v. United States*, 532 U.S. 59 (2001)(standard of review issue), the district court denied Jeter an acceptance reduction because he continued to engage in fraudulent loan transactions after an arrest and indictment on similar state charges. A federal grand jury indicted Jeter on fraud charges about a year after his state indictment. *Id.* at 638. The district court reasoned that Jeter's

"repeated criminal activity" during that year meant that he "did not voluntarily terminate or withdraw from criminal conduct" even after he was aware that "his conduct was by some, at least, in part detected." *Id.* at 639. Jeter argued that this analysis was not appropriate since "did not continue to engage in criminal conduct once he pled guilty to the federal charges." *Id.* The Court agreed, finding that the district court could "not use Jeter's preindictment state crimes as a basis for denying him a reduction for acceptance of responsibility on the federal charges." *Id.*

The Court stressed that district courts do not have "unbridled discretion" in determining the time-period for acceptance of responsibility. *Id.* at 640. Instead, a defendant must be on notice of the federal government's interest in his affairs before §3E1.1 takes effect. *Id.* at 639-40. For Jeter, that date occurred on the date of his indictment. *Id.* at 641. The *Jeter* court required "that there be some conduct that the court can find is inconsistent with that *specific* acceptance of responsibility referred to in the Commentary, namely the acceptance of the guilty plea." *Id.* (emphasis added). Otherwise, courts

would be punishing a defendant for criminal disposition, not because he failed to accept responsibility for federal charges. *Id.*

The Court refined *Jeter*'s holding in *United States v. Tilford*, 224 F.3d 865 (6th Cir. 2000), *abrogated on other grounds, Buford v. United States*, 532 U.S. 59 (2001)(standard of review issue); *see also United States v. Hakley*, 101 Fed. Appx. 122, 128 (6th Cir. 2004)(describing *Tilford* in this manner). In 1993, the IRS interviewed Tilford and said that it was investigating his tax returns; this put Tilford on notice that "the federal government had an interest in his affairs." *Tilford,* 224 F.3d at 868. Tilford did not accept responsibility then and "actually refused responsibility after momentarily agreeing to cooperate. . . ." *Id.* Federal authorities did not arrest or charge Tilford at that time. *Id. Tilford* concluded that in light of *Jeter,* "it is the period *following the entry of Tilford's guilty pleas*, not the period following the 1993 IRS interview, that is relevant for purposes of evaluating Tilford's acceptance of responsibility." *Id.* (emphasis added); *see also United States v. Rodgers*, 2789 F.3d 599, 601 (6th Cir. 2002)(describing *Jeter* as cabining "the relevant time period for acceptance of responsibility [as] the date that federal authorities indict the defendant and he becomes

aware that he is subject to federal investigation and prosecution"). Since Tilford did not engage in subsequent criminal or "otherwise inconsistent conduct" after his guilty pleas, the district court erred in denying him an acceptance reduction. *Tilford*, 224 F.3d at 868.

This line of cases demonstrates that the district court erred when it denied Green an acceptance reduction based on her pre-indictment statements to investigators. While Green focused on her statements about "syringes" in this section, the following discussion about her plea colloquy is the appropriate place to discuss the district court's concern about "poison."

### b. Acceptance looks to a party's conduct after her guilty plea, but even if the Court considers Green's questions about "knowingly" at that colloquy, it supports the grant of acceptance here.

The time *after* the entry of a defendant's guilty plea is the relevant period to evaluate a defendant's acceptance of responsibility. *Tilford*, 224 F.3d at 868. After all, the purpose of the plea hearing is to ensure that a defendant's plea to the offense conduct is knowing, voluntary, and supported by a factual basis. *See generally* Fed. R. Crim. P. 11. But considering the plea colloquy and how Green and Theodorou used "poison" still requires reversal.

At the sentencing hearing, the district court found that Green "was very particular about she only knew about anything after the fact" at her plea hearing. (TR 10/1/24, R160 at 188, Page ID#3445) This concern stemmed from Green's "parsing the word 'knowingly' and making a bid deal about after the fact at the time of her change of plea." (*Id.* at 188-89, Page ID#3445-46)

Green pleaded without a plea agreement to the only charge in the indictment against her: accessory after the fact. Here is the relevant use of the word "knowingly," read by the AUSA at the outset of the factual basis of the plea colloquy:

> On or about April 24th, 2022, Amanda Hovanec and Anthony Theodorou did *knowingly* and intentionally distribute a controlled substance to T.H. that resulted in T.H.'s death.

(TR 10/17/23, R66 at 34, Page ID#619) When the district court asked if the prosecutor was "right," Green replied, "The charges are correct." (*Id.* at 35, Page ID#620) The district court pressed Green about whether she did what the prosecutor said she did. (*Id.*)

Green replied, "The knowingly . . I said that I'm questioning the 'knowingly,' like that there was – *I forgot how you started.*" (*Id.*)(emphasis added) Green said, "I don't know what they did," and

when asked if she knew "that they killed T.H.," she responded, "I did, after the fact" and "I just don't know how." (*Id*.) Green affirmed again that she knew after the fact that Amanda and Theodorou killed T.H. (*Id*. at 36, Page ID#621)

After a discussion with the prosecutor and Green, trial counsel described it as "knowingly (sic) culpability," stating that how it played out in court "sounded different" than what he had discussed with her.[6] (*Id*. at 41, Page ID#626) But Green's concern was more basic and focused, as the transcript reflects:

> THE COURT: . . . you knew they killed T.H., I'm thinking, in the driveway there; right? I mean, you knew that it had happened; correct?

---

[6] The charge against Green alleged in its entirety that

> On or about April 24, 2022 and continuing through April 28, 2022, in the Northern District of Ohio, Western Division, Defendant ANITA GREEN, knowing that Amanda Hovanec and Anthony Theodorou had caused the death of T.H. by means of distribution of a controlled substance, did receive, relieve, comfort and assist Hovanec and Theodorou in order to hinder and prevent their apprehension, trial and punishment, in violation of Title 18, United States Code, Section 3.

THE DEFENDANT: I know. Yes, I do.

THE COURT: All right. And they did it with some kind of drug that they imported.

You knew that also, correct?

DEFENDANT: *After the fact.*

(*Id.* at 42, Page ID#627)(emphasis added) [7]

As the plea colloquy evinces, Green's clarification of "after the fact" went to her knowledge of the controlled substance: She did not know until *after that fact* that Amanda and Theodorou "knowingly and intentionally distribute[d] a controlled substance to T.H. that resulted in T.H.'s death." (*Id.* at 34, 42, Page ID#619, 627) This is entirely consonant with Green's interviews and even Theodorou's testimony at the sentencing hearing.

In her pre-indictment interviews, Green said:

[Amanda] said, [a towel] had poison or is poison or something . . .I was totally confused because when I think of someone having poison, . . . they're going to have to drink it. . . .

---

[7] As the two questions cited in the text show, the district court did not ask Green if she knew that Amanda and Theodorou intended to kill T.H. No one would know whether someone had been killed until after he had, in fact, been killed.

(Interview 4/27/22, R104-5 at 97, Page ID#1459) When asked by investigators if Amanda said "how she was going to kill" T.H., Green replied, "She said the word poison." (*Id*. at 98, Page ID#1460) In an interview the next day, Green repeated that Amanda told her that she had "poison." (Interview 4/28/22, R 104-7 at 9-10, 21-22, 27, Page ID#1479-80, 1491-92, 1497) An investigator asked, ". . . [D]id she [Amanda] tell you she used drugs, did she tell you she used a syringe?," and Green replied, "She told me poison she didn't tell me . . .," before the investigator cut her off. (*Id*. at 21, Page ID#1491)

At the sentencing hearing, the government elicited testimony from Theodorou about how he mailed the controlled substance from South Africa to Amanda in Ohio. (TR 10/1/24, R 160 at 42-47, Page ID#3299-3304) Theodorou never mentioned Green during this recitation. In fact, after the discussion of the drug importation, the district court called counsel to the bench to observe that "we are getting in pretty fine detail here about all of *Amanda's* bad acts" and asked the government to "fast-forward a little bit to get to Mrs. Green." (*Id*. at 47, Page ID#3304)(emphasis added)

Theodorou's first interaction with Green occurred on Friday, April 22, 2022. (*ID.* at 52-53, Page ID#3309-10) He recalled a conversation that night with Amanda, Green, and another of Green's daughters where Amanda said "she was going to – to kill" T.H. (*Id.* at 54, Page ID#3311) When asked on cross about whether any discussion of planning the killing occurred, Theodorou replied, "There was points that *a poison would be utilized*." (*Id.* at 93, Page ID#3350)(emphasis added)[8]

Theodorou confirmed what Green told investigators: Amanda told Green that a poison would be used. That is why when asked if she knew that Amanda and Hovenac "did knowingly and intentionally distribute a controlled substance to T.H. that resulted in T.H.'s death," Green replied that she did – but only after the fact. Until T.H.'s death, Amanda told her mother only that she planned to use "poison," which does not necessarily encompass or suggest a controlled substance.

---

[8] According to the PSR, Amanda herself said that she "did not know what she injected into T.H." and "referred to it as 'poison' or a 'drug'. . . ." (PSR at 6, ¶14)

### c. The §3E1.1 factors support an acceptance reduction.

In denying Green's bid for acceptance of responsibility, the district court relied on Green's pre-indictment statements and attributed the words "after the fact" in her plea colloquy not to her knowledge of the use of a controlled substance, but *all* actions taken by Amanda and Theodorou. This is an erroneous attribution in light of Green's post-indictment and post-plea actions.

The grand jury returned its indictment on May 25, 2022. (Indictment, R11 at 1, Page ID#85) At sentencing, the government leaned heavily into Green's preindictment statements to investigators on April 27 and 28, 2022. (TR 10/1/24, R160 at 133-40, Page ID#3390-97) But Green proffered on September 1, 2022; compared to Green's preindictment statements, the government elicited little testimony from the FBI agent about that interview. (*Id.* at 140-41, Page ID#3397-98) In her proffer statement, Green admitted that she lied to agents in her preindictment interviews and that "Amanda had told her before [T.H.] arrived on Sunday[, April 24, 2022], that she [Amanda] had to do something." (*Id.* at 140, Page ID#3397) Green told Amanda to "pray that there's got to be another way." (*Id.*) The agent said that Green

"made a big deal about the fact that the word poison had been put into her head by the interviewing agents," but attributed that word's first use to Green herself. (*Id.* at 140-41, Page ID#3397-98) The agent had "no evidence of Ms. Green's involvement prior to Friday, April 22." (*Id.* at 150, Page ID#3407)

Theodorou testified at the sentencing hearing that Green was involved in, or present at, other matters from Friday, April 22 to Sunday, April 24, prior to the death of T.H.:

- On Friday night, Green listened to Amanda say that she was going to kill T.H. and explained to her mother that she needed to "[distract] the girls away from what was actually going on in the day." (*Id.* at 55, Page ID#3312)

- On Saturday afternoon, Green drove Amanda to a piece of land that might be a good place to dispose of a body. (*Id.* at 57-58, Page ID#3314-15)

- On Saturday evening at dinner, Green was present during a conversation about digging a hole that evening for T.H.'s body and not utilizing that piece of land. Green provided overalls and Wellington boots. Green drove Amanda and Theodorou to

dig the grave with knowledge of what they intended to do, dropped them off, and drove by hourly until Amanda and Theodorou finished. (*Id.* at 58-62, Page ID#3315-19)

- On Sunday morning, Green went to church to try to make peace with what was going to happen. (*Id.* at 63, Page ID#3320)

- On Sunday afternoon, Theodorou told Amanda that "this is not happening," and Green "brought up a legal matter for the custody dispute of the girls." Green tried to present an alternative to killing T.H., but Amanda said no. (*Id.* at 65, Page ID#3322)

- On Sunday evening, after T.H. arrived, Green occupied the girls with toys that Amanda and Theodorou bought at Walmart. (*Id.* at 67-68, Page ID#3324-25)

The government did not elicit any testimony from the FBI agent that Green was asked about these topics at her proffer interview; again, the testimony that the government elicited from the agent was that Green proffered, knew something was going to happen, told Amanda that there had to be "another way," and had heard about "poison."

Again, Green's "after the fact" comment in the plea colloquy went to whether she knew before T.H.'s death that Amanda intended to use a controlled substance:

> THE COURT: All right. And they did it with some kind of drug that they imported.
>
> You knew that also, correct?
>
> DEFENDANT: *After the fact.*

(TR 10/17/23, R66 at 42, Page ID#627) It was not that Green "was very particular about *she only knew about anything after the fact*" at her plea hearing, as the district court surmised. (TR 10/1/24, R160 at 188, Page ID#3445)(emphasis added) This misapprehension led to the erroneous denial of acceptance of responsibility to Green.

Acceptance requires a defendant to admit truthfully offense and not falsely deny any relevant conduct. U.S.S.G. §3E1.1, comment. (n. 1(A) & n. 3). It does not require a defendant "to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction" to obtain an acceptance reduction. *Id.*, n. 1(A). Green was not required to "volunteer, or affirmatively admit" all details of relevant conduct, and the government produced no evidence at sentencing showing that

agents confronted Green with Theodorou's details and Green falsely denied them.[9]

Other facts support Green's acceptance of responsibility. Green proffered on September 1, 2022, and 13 months later, pleaded guilty. *See* U.S.S.G. §3E1.1, comment. (n. 1(H))(timeliness). In January 2024, Green settled a civil suit brought by T.H.'s estate; the record supports an inference that she sold her home and cashed out her retirement plan to fund the settlement. (Settlement Agreement, R151-1, Page ID#3237-3241; PSR at 11, ¶51) Green was the only one of the three defendants to do so. (TR 10/1/24, R160 at 183, Page ID#3440)

The district court premised the denial of acceptance on Green's statements made prior to indictment and her plea and on a misapprehension of a clarification Green sought to make at the change of plea. The denial of acceptance in this case was error.

---

[9] The only pre-death conduct by Green that the PSR described was that "Green was waiting by the door to take the children inside the residence" immediately after T.H. arrived on April 24. (PSR at 6, ¶11)

**Where the statute permits the award of the expenses of necessary psychological care "in the case of an offense resulting in bodily injury to a victim," did the district court err in awarding restitution for past and future mental health treatment to victims who did not suffer bodily injury?**

The district court awarded $126,000 in restitution for past and future mental health treatment for the minor children of T.H. The minor children did not suffer any bodily injury. The plain language of the statute allows restitution for psychological care only for victims of bodily injury. Since there was no statutory authority for this award of restitution, the Court should reverse the district court's order.

## Standard of review

The Court reviews the propriety of a restitution order *de novo* and the amount of restitution for abuse of discretion. *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013); *see also United States v. Evers*, 669 F.3d 645, 655 (6th Cir. 2012)(observing that the Court applies *de novo* review to determine whether the law permits restitution, and if so, applies abuse of discretion review to the amount). "Because federal courts have no inherent power to award restitution, [a court] may order

restitution orders are proper only when and to the extent authorized by statute." *Evers*, 669 F.3d at 655-56 (cits. omitted).

**Argument**

When confronted with plain statutory language, the court's "sole function . . . is to enforce it according to its terms," as long as the "disposition required by the text is not absurd." *Id.* If the "statutory language is unambiguous and the statutory scheme is coherent and consistent," the court's inquiry ends. *Id.* "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 656, *citing Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997).

Here is the restitution statute at issue[10]:

(b) The [restitution] order may require that such defendant –

*****

(2) in the case of an offense resulting in *bodily injury* to a victim . . .

> (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment.

18 U.S.C. §3663(b)(2)(A)(emphasis added). The plain meaning of "bodily injury" is "[p]hysical damage to a person's body." Black's Law Dictionary, "Injury," "bodily injury" (12th ed. 2024); *see also* Merriam-Webster Online Dictionary, "Bodily Injury," accessible at

https://www.merriam-webster.com/legal/bodily%20injury (defining

---

[10] The district court considered and applied the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §3663A. (Order, R161 at 2-3, Page ID#3486-87) Green's offense of conviction was for accessory after the fact, 18 U.S.C. 3. (Judgment, R138 at 1, Page ID#3163) The MVRA applies to a specific set of offenses, and while that set could be expanded by plea agreement, there was not a plea agreement here. *See* 18 U.S.C. §3663A(c)(1), (2). Thus, the applicable statute is the Victim and Witness Protection Act, 18 U.S.C. §3663, which applies to "a defendant convicted of an offense under [Title 18]." *See* 18 U.S.C. §3663(a)(1)(A). While it is important to identify the governing statute, this is largely a distinction without a difference given the identical language in §3663(b)(2)(A) and §3663A(b)(2)(A).

bodily injury as "any damage to a person's physical condition including pain or illness"); *see generally United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019)(instructing that a court "may look to a dictionary definition for guidance" to discern the plain meaning of statutory language).

For §3663(a)(2)(A) to apply at all, there must be a victim. By statute, a victim is one "directly and proximately harmed as a result of the commission of an offense." *See* 18 U.S.C. §3663(a)(2). The government and the district court identified a single class of victims of Green's accessory-after-the-fact conviction: T.H.'s minor children, which were Green's grandchildren. The government distinguished its request with respect to Green from the restitution it sought against Amanda and Theodorou. As to the latter, "Victim T.H. died as a direct and intended result of their conduct," which made restitution available to his estate and family under §3663(a)(1)(A). (Govt's Br. on Restitution, R106 at 16, Page ID#1520) The government argued that restitution from these defendants' "culpable conduct should comprise every form of restitution the government seeks," whether lost income, counseling for

the minors, funeral expenses, property damage, and the family's costs and expenses of participating in the criminal proceeding. (*Id.*)

But the government sought only limited restitution against Green:

Defendant Anita Green pleaded guilty to being an accessory after the fact. 18 U.S.C. §3. Although this crime did not directly cause T.H.'s death, it contributed to the Minor Victims' trauma and suffering. After all, the Minor Victims had to learn that their own grandmother – who had been watching them – did not look out for their best interests, but rather helped their father's killers cover up their wrongdoing. As a result, the Minor Victims have suffered psychological harm . . . .

(*Id.* at 17, Page ID#1521) The government thus acknowledges two important things: 1) Green's offense did not result in bodily injury to T.H. since it involved "help[ing] [the minor victims'] father's killers cover up their wrongdoing" and did not cause T.H.'s death; and 2) Green's offense resulted only in "psychological harm" to the minor victims. The district court, noting that Green did "not appear to dispute the children fit within [the statutory] definition of 'victim,'" extended its restitution analysis only to them. (Restitution Order, R1616 at 2, Page ID#3486)

"[I]n the case of an offense resulting in *bodily injury* to a victim," §3663 allows restitution for psychological care. 18 U.S.C. §3663(b)(2)(A).

By the government's own reckoning, the only injury to the minor victims was "psychological harm." (Govt's Br. on Restitution, R106 at 17, Page ID#1521) Psychological harm is not within the plain meaning of bodily injury. This definition is consonant not only with the dictionary definition, but with cases in this Court and other circuits.[11]

In *United States v. Patton*, 651 Fed. Appx. 423, 426-27 (6th Cir. 2016), the Court considered 18 U.S.C. §3663A(b)(2)(C),[12] which allows reimbursement of "the victim for income lost by such victim as a result of such offense" "in the case of an offense resulting in bodily injury to a victim." The Court found that the statute plainly covers lost wages for the person who suffered bodily injury, but as two other circuits had held, "the statute forecloses lost-wages reimbursement for family members who suffered no bodily injury." *Id*. at 426.

---

[11] District courts have denied restitution for psychological counseling absent bodily injury. *E.g., United States v. Rivera-Solis*, 2024 WL 2044744 at *54-55 (D.P.R. May 8, 2024)(denying restitution for therapy to wife of children of murder victim since they did not suffer bodily injury, and collecting cases).

[12] This is the same language used in 18 U.S.C. §3663(b)(2)(C).

*Patton* cited *United States v. Wilcox*, 487 F.3d 1163, 1176-77 (8th Cir. 2007). D.T., a minor, suffered sexual abuse. *Id.* at 1167. The district court awarded D.T.'s mother restitution for her (the mother's) lost income, and the Eighth Circuit reversed. *Id.* at 1177. It reasoned that the lost wages statute referred to "*the* victim," which necessarily referred to "the victim who suffered bodily injury." *Id.* at 1176. D.T.'s mother suffered no bodily injury, so she could not recover her own lost wages. *Id.* at 1176-77.

The Eighth Circuit later addressed the issue of restitution for psychological counseling in *United States v. Reichow*, 416 F.3d 802, 805-06 (8th Cir. 2005). Reichow committed an armed bank robbery, and the district court awarded restitution to include psychological counseling for bank employees. *Id.* at 803-804. The Eighth Circuit reversed: Section 3663(b)(2)(A) authorizes restitution for counseling only where the offense results in bodily injury to a victim, and the evidence did not show that any of the bank's employees suffered a bodily injury. *Id.* at 806.

This is consistent with the holding of other circuit courts. In *United States v. Dayea*, 73 F.3d 229 (9th Cir. 1995), the Ninth Circuit

considered restitution for the widow of an on-duty police officer killed by a drunk driver. The Ninth Circuit found that the officer' widow "did not suffer bodily injury and therefore was not eligible for restitution under [§3663] for the losses the court cited as the basis of its order." *Id*. at 231. The Ninth Circuit stressed that the VWPA did not function as a "wrongful death statute under which very broad recovery is permitted" but limited restitution to certain recipients and types of losses. *Id.*; *cf. United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991)(noting in case involving bombing of a coal mine that miners could not receive restitution for lost income because "[t]here were no bodily injuries"); *United States v. Powell*, 42 Fed. Appx. 565 (4th Cir. 2002)(reversing restitution award of psychological and psychiatric counseling and hospitalization charges incurred by kidnaping victims since none of the victims suffered any bodily injury and noting that the "Government concedes error").

*Dayea* followed the Court's earlier precedent in *United States v. Hicks*, 997 F.2d 594 (9th Cir. 1993), which vacated a restitution award for psychological counseling for IRS employees. Although Hicks "initiated a series of attacks against IRS buildings throughout

California," no IRS employee suffered physical injury. *Id.* at 596, 601. The Ninth Circuit found that "[t]he cost of psychological counseling can be included in a restitution order only when the victim has suffered physical injury," meaning that the restitution order was erroneous. *Id.* at 601.

In reaching its conclusion that "bodily injury" encompassed psychological injury, the district court noted *Hicks* but relied on *United States v. Breshers*, 684 F.3d 699, 702-03 (7th Cir. 2012), and *United States v. Dotson*, 242 F.3d 391, 2000 WL 1820375 (Table)(10th Cir. 2000), to find that "'bodily injury' can be read to encompass psychological injury." (Restitution Order, R161 at 2-3, Page ID#3486-87) Both *Breshers* and *Doston* involved plain error review, which makes a difference in the result: Plain error must be error that is plain under binding precedent or the governing statute. *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015)(stating that "[a] lack of binding case law that answers the question presented will. . . preclude our finding of plain error").

For the first time on appeal, Breshers argued that the district court erroneously ordered restitution to two victims who suffered no

bodily injury. *Breshers*, 684 F.3d at 701-02. The Seventh Circuit found that since the statute did not include a definition of bodily injury, it could be argued that bodily injury meant either physical damage to a person's body *or* (citing *Dotson*) an umbrella term that encompassed both physical and psychological care. *Id*. at 702. The Seventh Circuit noted, too, that other statutes "include[d] mental injury in the definition of bodily injury," although one excluded "solely emotion or psychological harm to the victim." *Id*. at 702-03. This led the Seventh Circuit to suggest that the statute was ambiguous and "at best unclear on the question whether it includes mental injury." *Id*.

*Dotson* declined to reach the issue of whether these types of restitution expenses could be predicated on mental injuries alone: "At best, the statute is ambiguous with regard to the scope of 'bodily injury' and the law is by no means clearly established," making the district court's award not plainly erroneous. *Dotson*, 242 F.3d 391 (Table), 2000 WL 1820375 (10th Cir. Dec. 12, 2000). *Dotson* cited a statute and a guideline for the proposition that "[f]ederal law deems mental injury to constitute bodily injury in other contexts," and opined that §3663(b)(2)'s use of "bodily" in a statute that enumerated "physical, psychiatric, and

psychological care" separately led to an argument that "bodily injury" is a "holistic phrase referring to all aspects of the body, physical and psychological." *Id*.

The district court noted the holding in *Hicks,* but found that "bodily injury" could be read to encompass psychological injury. These arguments, while perhaps fitting for plain error review, are unavailing here. *First,* this Circuit, as well as the Fourth, Eighth, and Ninth Circuits, have suggested – if not downright held – that psychological counseling (or similarly, lost income) is not compensable for a victim who did not suffer bodily injury. The government even confessed error in a Fourth Circuit case to that effect. Bodily injury plainly means injury to the body. The statute provides for restitution for psychological counseling to victims who suffer bodily injury. That is not ambiguous.

*Second,* Congress could have – but did not – chosen to define "bodily injury" in §3663(b) to encompass "impairment of the function of a . . . mental faculty," like it has done in four other provisions of Title 18. *E.g.,* 18 U.S.C. §§831(f)(5), 1365(g)(4), 1515(a)(5), 1864(d)(2). A statutory definition of "bodily injury" typically would control the statutory meaning of that term. *See Burgess v. United States*, 553 U.S.

124, 129-131 (2008). If Congress wanted "bodily injury" in §3663(b) to encompass psychological injury, it "easily could have written" §3663(b) to include the expanded definition found in four other criminal statutes. *Id*.; *see Moore v. Harris*, 623 F.2d 908, 914 (4th Cir. 1980)(noting that the "use of different language creates the inference that Congress meant different things").

The district court concluded that the lack of definition of "bodily injury" in §3663(b)(2), in light of the definition of that term in other statutes, meant that "bodily injury" *could* be read to encompass psychological harm. (Restitution Order, R161 at 3, Page ID#3487) This statute is unambiguous, and the plain meaning of "bodily injury" means just that. The district court's "sole function . . . is to enforce [the statute] according to its terms" unless it would lead to an "absurd" disposition. *Hasler v. United States*, 718 F.2d 202, 204 (6th Cir. 1983) (cits. omitted). Enforcing the plain language of the statute would not yield an absurd result. Instead, it would comport with what Congress intended.

## CONCLUSION

For these reasons, the Court should reverse and remand this case for resentencing with an acceptance of responsibility reduction and reverse the award of restitution.

Respectfully submitted this 11th day of March, 2025.

> s/ Amy Lee Copeland
> Amy Lee Copeland
> Georgia Bar No. 186730
> Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 9,711 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This 11th day of March, 2025.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

## CERTIFICATE OF SERVICE

I served a copy of this brief on counsel for the government by filing it on the Court's EC/CMF portal, which emails to all counsel of record a link to a file stamped .pdf copy of the brief.

This 11th day of March, 2025.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Indictment, R11.........................................................................Page ID#85-89

Plea Transcript (10/17/23), R66....................Page ID#586, 609, 618-30

Transcript of 4/27/22 Interview, R104-5....................Page ID#1459-60

Transcript of 4/28/22 Interview, R104-7 .................Page ID#1479-80, 1491-92, 1497-98

Restitution Br., R106............................................Page ID#1511, 1520-21

Govt's Supp. Sent' Mem., R125 .............................Page ID#2489, 2492

Judgment, R138..........................................................Page ID#3164

Notice of Appeal, R144..............................................Page ID#3214

Def.'s Br. in Opp. To Restitution, R151 ....................Page ID#3232-33

Settlement Agreement, R151-1....................................Page ID#3237-41

Sentencing Transcript (10/1/24), R160 ..........................Page ID#3258, 3291-3304, 3309-12, 3314-20, 3322, 3324-25, 3307-34, 3350, 3389-3400, 3407, 3422-49, 3445-47, 3475

Restitution Order, R161....................................Page ID#3485-90

Amended Judgment, R162.............................................Page ID#3490-96

Notice of Appeal, R164..........................................Page ID#3716

Presentence Investigation Report (Sealed)..............Pages 4-6, 8-12, 18