# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

No. 24-3887
No. 25-3017
(consolidated)

_____


UNITED STATES OF AMERICA,

Appellee,

v.

ANITA GREEN,

Appellant.

_____

Direct appeal from a sentence and restitution order
in the Northern District of Ohio

_____

REPLY BRIEF

_____


Amy Lee Copeland
Georgia Bar No. 186730
Rouse + Copeland LLC
602 Montgomery Street
Savannah, Georgia 31401
(912) 807-5000

Attorney for Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES.......................................................... iii

BACKGROUND ...............................................................................1

ARGUMENT AND CITATION OF AUTHORITY...........................3

The acceptance of responsibility appeal .........................................4

    Government's argument: Green's presentence report statements
    warranted denying an acceptance of responsibility reduction. (Br.
    of Appellee at 47-51)..................................................................4

    Government's argument: Green also did not fully accept
    responsibility by minimizing her knowledge during the plea
    colloquy. (Br. of Appellee at 51-54) .......................................10

    Government's argument: Sentencing courts may consider
    defendants' pre-indictment admissions to federal investigators in
    considering whether they have consistently accepted
    responsibility. (Br. of Appellee at 54-58) ...............................18

The restitution appeal...................................................................23

    Government's argument: Section 3663(b)(2)(A)'s "bodily injury"
    provision includes psychological harm the defendant caused a
    victim. (Br. of Appellee at 60-65) ...........................................23

    Government's argument: Green nevertheless caused T.H.'s
    daughters to suffer bodily injury – including physical harm – thus
    entitling them to restitution under Section 3663(b)(2)(A). (Br. of
    Appellee at 65-67)..................................................................10

Government's argument: Section 3663(b)(2)(A) does not require "a victim" who suffered bodily injury to be the same victim receiving psychological care. (Br. of Appellee at 67-68) ...................... 18

CONCLUSION ................................................................. 32

CERTIFICATE OF COMPLIANCE ............................................. 33

CERTIFICATE OF SERVICE ..................................................... 34

DESIGNATION OF RELEVANT DISTRICT COURT

DOCUMENTS ................................................................. 35

# TABLE OF AUTHORITIES

## **Cases**

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) ...................... 21-22

*United States v. Acevedo-Osorio*, 118 F.4th 117 (1st Cir. 2024) .............. 28

*United States v. Al-Maliki*, 787 F.3d 784 (6th Cir. 2015) ........................ 21

*United States v. Anthony*, 24 Fed. Appx. 444 (6th Cir. 2001) ................... 7

*United States v. Breshers*, 684 F.3d 699 (7th Cir. 2012) ......................... 24

*United States v. Casados*, 26 F.4th 845 (10th Cir. 2022) ......................... 28

*United States v. Dotson*, 242 F.3d 391, 2000 WL 1820375 (Table)(10th
  Cir. 2000) ........................................................................... 24

*United States v. Fike*, 140 F.4th 351 (6th Cir. 2025) ............................... 30

*United States v. Follet*, 269 F.3d 996 (9th Cir. 2001) ............................. 25

*United States v. Hakley*, 101 Fed. Appx. 122 (6th Cir. 2004) ............. 16-18

*United States v. Hall*, 664 Fed. Appx. 479 (6th Cir. 2016) ....................... 7

*United States v. Hicks*, 997 F.2d 594 (9th Cir. 1993) .............................. 24

*United States v. Jeter*, 191 F.3d 637 (6th Cir. 1999) .......................... 16-18

*United States v. Lay,* 583 F.3d 436 (6th Cir. 2009) .................................. 7

*United States v. Lopez Paniagua*, 828 Fed. Appx. 307 (6th Cir. 2020) ... 22

*United States v. Mukes*, 980 F.3d 526 (6th Cir. 2020) .............................. 9

*United States v. Nash,* 65 Fed. Appx. 546 (6th Cir. 2003)..........................8

*United States v. Olano*, 507 U.S. 725 (1993) ...........................................21

*United States v. Patton*, 651 Fed. Appx. 423 (6th Cir. 2016)..................26

*United States v. Powell*, 42 Fed. Appx. 565 (4th Cir. 2002).....................24

*United States v. Reichow*, 416 F.3d 802 (8th Cir. 2005) ..........................24

*United States v. Rodgers*, 2789 F.3d 599 (6th Cir. 2002)...................16-17

*United States v. Sengamy,* 590 Fed. Appx. 494 (6th Cir. 204) .................8

*United States v. Sharp*, 927 F.2d 170 (4th Cir. 1991)..............................26

*United States v. Tilford*, 224 F.3d 865 (6th Cir. 2000) ............................16

*United States v. Trevino,* 7 F.4th 414 (6th Cir. 2021)...............................15

*United States v. Verduzco,* 585 Fed. Appx. 562 (6th Cir. 2014) ...............7

*United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007)............................26

*United States v. Wolfe,* 71 F.3d 611 (6th Cir. 1995)...................................7

*United States v. Zerpa-Ruiz,* 784 Fed. Appx. 353 (6th Cir. 2019) .............7

## **Other Authorities**

Black's Law Dictionary (12th ed. 2024) ....................................................29

Fed. R. App. P. 32(a)(5) ....................................................33

Fed. R. App. P. 32(a)(6) ....................................................33

Fed. R. App. P. 32(a)(7)(B)(ii) ....................................................33

Fed. R. App. P. 32(f) ....................................................33

Fed. R. Crim. P. 52(b) ....................................................21

U.S.S.G. App. C, Amendment 820 (Nov. 1, 2023) ....................................................8

U.S.S.G. Ch. 5, Pt. A (Sent'g Table) ....................................................22

U.S.S.G. §3B1.2 ....................................................5

U.S.S.G. §3E1.1, comment. (n. 1(A)) ....................................................8

U.S.S.G. §3E1.1, comment. (n. 2) ....................................................15

U.S.S.G. §3E1.1(b) ....................................................8

U.S.S.G. §5K2.12 ....................................................5

## BACKGROUND

In these consolidated appeals, appellant Anita Green appeals the denial of a reduction for acceptance of responsibility under U.S.S.G. §3E1.1 (appeal no. 24-3887) and the award of restitution for mental health treatment to victims who suffered no bodily injury (appeal no. 25-3017).

The facts have been set forth extensively in Green's principal brief. (Br. of Appellant at 11-22)[1] Facts relevant to this reply brief, with citations to the record, appear in the argument section. Green sets forth the following brief narrative to aid the reader.

Co-defendant Amanda Hovenac ("Amanda") is Green's daughter and during the relevant time in this case, lived with Green in Ohio. Amanda. Amanda was married to T.H., and they had three young children.  As part of T.H.'s job with the State Department, T.H. moved the family to South Africa. Amanda began a relationship with co-defendant Anthony Theodorou ("Theodorou"), and later divorced T.H.

---

[1] Citations to page numbers for the respective briefs refer to the page numbers assigned at filing that appear at the top of the brief.

Due to custody issues over the children, Amanda decided to kill T.H. and asked Theodorou to obtain the means to do so. Theodorou sent Amanda etorphine, an animal tranquilizer, from South Africa to Ohio. In interviews, Amanda and Green referred to the substance as "poison," and Theodorou made a similar statement in his testimony at Green's sentencing. T.H. went to Ohio for an April 22, 2022, custody hearing. On April 24, 2022, when T.H. dropped the children off at the house shared by Green and Amanda, Green took the children inside, and Amanda injected T.H. with etorphine, which killed him. A camera in T.H.'s car recorded these events. Aided by Green, Amanda and T.H. disposed of Theodorou's body.

On April 27 and April 28, 2022, Green gave a series of interviews with the local sheriff's office, aided by the FBI. Green initially lied to investigators about T.H. By the end, Green admitted that she knew that Amanda intended to use a "poison" to kill him. By indictment returned on May 25, 2022, a grand jury charged Green with being an accessory after the fact for her actions between April 24 and April 28, 2022. Green proffered to federal authorities in September 2022, and pleaded guilty without a plea agreement on October 17, 2023.

The government initially recommended a reduction for acceptance of responsibility but reversed course shortly before the sentencing hearing. At that October 1, 2024, hearing, the government called Theodorou and an FBI agent to testify against Green and argued that that testimony demonstrated that she had minimized her role in her preindictment statements to investigators. The government also relied on a portion of Green's plea colloquy. The district court agreed with the government and sentenced Green to 121 months' imprisonment. It later imposed a restitution award against Green, jointly and severally with her co-defendants, to encompass psychological counseling for the three children.

## ARGUMENT AND CITATION OF AUTHORITY

Green appealed the denial of an acceptance of responsibility reduction (Br. of Appellant at 26-45) and the award of restitution for psychological treatment for victims who suffered no bodily injuries (Br. of Appellant at 46-57). The government's response often abandons the position taken by the trial prosecutor and proceeds on a different path. The government's "right-for-any-reason" argument is wrong for many reasons. It is replete with legal misunderstandings and factual

3

misapprehensions. Green addresses those arguments as described in

the government's brief subheadings.

## The acceptance of responsibility appeal

### Government's argument: Green's presentence report statements warranted denying an acceptance of responsibility reduction (Br. of Appellee at 47-51)

The government contends that Green's "own post-plea statements.

. . independently warrant[]" the denial of acceptance of responsibility,

particularly on plain-error review." (Br. of Appellee at 47)[2] Fairly

characterized, Green's "own post-plea statements" are sentencing

objections made by her attorneys for a minimal role reduction and a

downward departure based on duress and coercion. The government's

---

[2] As the government's brief tacitly acknowledges, this was not a claim squarely made by the trial prosecutors. (Br. of Appellee at 47)("whether the district court properly used Green's pre-indictment statements to deny an acceptance of responsibility reduction. . . is unnecessary for this Court to resolve . . . .")

The district court did not view those objections as disqualifying Green from an acceptance reduction; he treated them as part-and-parcel of that argument. (TR 10/1/24, R160 at 22, Pg ID#3279)(". . . If I'm going to take away acceptance of responsibility, I am sure as heck not going to find all the things [the defense is] asking me to find. And, conversely, if I were to find the things you are asking for, I'm probably going to stand on the acceptance of responsibility . . . .)

argument cites cases that involve actual statements made by defendants, whether in a presentence investigation report ("PSR") interview, at allocution, or in trial testimony. It ignores the guidelines' treatment of the issue and Sixth Circuit precedent on the findings necessary to sustain a denial of acceptance based on sentencing objections.

Green's PSR objections requested a minimal role reduction under U.S.S.G. §3B1.2 and a downward departure for duress and coercion under U.S.S.G. §5K2.12. (Revised PSR at Addendum, pages 19-20, 24-25; Second Revised PSR at Addendum, pages 50-51, 55-56) The government objected to both requests but did not argue initially that they warranted a loss of acceptance of responsibility. (Revised PSR at Addendum, pages 20-23, 25; 51-54, 56) Shortly before Green's sentencing, the government objected the acceptance reduction, citing "newly discovered information from defendant Anthony Theodorou" (a February 6, 2024, interview) and "confirmation of that newly discovered information by [defendant] Amanda Hovenac." (Govt's Supp. Sent'g Mem., R125 at 1, Page ID#2489)(Sealed)

The government identifies none of Green's *own* statements in the PSR as minimizing or mischaracterizing her role; it relies instead on objections made by her attorneys. Here is Green's own statement to the probation officer:

> There has not been a moment that has passed in which I have not experienced deep regret and sorrow for what occurred. There has not been a day I have not broken down and cried tears for who and what is lost. I think about T.H. and his life lost, and I think about all the lives that were instantly shattered and forever altered. I cry and ache for all our families fractured beyond conception and description; I know that this tragic circumstance also changed their communities, church, and friendships. I think about how I was involved and how it happened. . . wishing and wanting to be able to undo all of it. Regrettably, I know that I cannot. In this horrific and sad reality, I am trying to do everything I can to help all the victims of this senseless loss of life. While the circumstances were unthinkable, as presented to me, I must be very clear that I make no excuse for my conduct and choice. Never would I have thought I could conduct myself in this way. In hindsight, I remain in surreal disbelief that I did, in fact, act as an accessory after the fact to the crimes committed by my daughter and Anthony Theodorou. I did this and I cannot change the moment. . . and no matter how desperately I wish otherwise, I cannot undo what I have done. I will forever live with that. I am so sorry to everyone that was hurt by my actions, which only made the horrific situation worse. I am deeply sorry and plan to make a further statement in Court. Thank you.

(PSR at 7, ¶20)

Except for an outlier, the government's cited "mischaracterization" cases at pages 49-50 do not involve attorney-prepared PSR objections.

*See United States v. Wolfe*, 71 F.3d 611, 616 (6th Cir. 1995)(referring twice to Wolfe's personal statement); *United States v. Zerpa-Ruiz*, 784 Fed. Appx. 353, 357 (6th Cir. 2019)(reciting that defendant received an obstruction enhancement based on his statements in the PSR interview, which warranted denial of acceptance reduction); *United States v. Lay*, 583 F.3d 436, 449 (6th Cir. 2009)(observing that defendant testified at the sentencing hearing about a proposed enhancement); *United States v. Anthony*, 24 Fed. Appx. 444, 447 (6th Cir. 2001)(stating that defendant denied only the third point under §3E1.1(b) based on conflict between his own testimony at the sentencing hearing and that of a co-defendant, which the court found to be more credible). *But see United States v. Hall*, 664 Fed. Appx. 479, 483 (6th Cir. 2016)(seemingly grounding denial in PSR objection).

Its minimization cases in the next argument (Br. of Appellee at 51-52) are to the same effect: The defendant herself made statements that resulted in the denial of acceptance of responsibility. *See United States v. Verduzco*, 558 Fed. Appx. 562, 565-66 (6th Cir. 2014)(affirming denial of acceptance reduction where obstruction enhancement given and opinion suggests that defendant evasive when speaking to the

probation officer); *United States v. Sengamy*, 590 Fed. Appx. 494, 497, 501 (6th Cir. 2014)(noting that defendant filed a *pro se* motion to withdraw guilty plea and testified at sentencing about drug quantity, which the district court did not find credible); *United States v. Nash*, 65 Fed. Appx. 546, 548-49 (6th Cir. 2003)(noting that defendant received obstruction enhancement, falsely testified at plea hearing, and lied in presentence interview).

The government never addresses the relevant application note about sentencing challenges or this circuit's precedent about findings a district court must make before denying a defendant acceptance of responsibility based on sentencing challenges. Indeed, application note 1(A) addresses how to consider this type of claim:

> A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous.

U.S.S.G. §3E1.1, comment., n. 1(A).[3]

---

[3] With the November 1, 2023, amendments, the Sentencing Commission clarified that sentencing objections are not an appropriate basis for the loss of the third point for acceptance under §3E1.1(b). *See* U.S.S.G. App. C, Amendment 820 (Nov. 1, 2023)(amending §3E1.1 to exclude

This application note reflects that "crediting the government's version of events over that of the defendant does not, on its own, mean that the defendant may be denied the reduction." *United States v. Mukes*, 980 F.3d 526, 540 (6th Cir. 2020). "Rather, the district court must specifically find that the defendant 'falsely denie[d] or frivolously contest[ed]' the facts." *Id*. "A mere determination that the government has met its burden of proof of the facts is not enough." *Id*. In *Mukes,* the Court vacated Mukes's sentence, remanded for resentencing on the existing record, ordered that two contested sentencing enhancements did not apply, and directed the district court to consider the issue of acceptance of responsibility. *Id*. While the Court suggested that it had a pretty good idea of how the acceptance issue would resolve on remand, that question was one "properly resolved by the district court." *Id*.

*Mukes* would require remand for the district court to address this argument in the first instance.

---

"sentencing objections" from "preparing for trial" definition, in part to remove "chilling effect" of "deterring defendants from pursuing . . . sentencing challenges"). Even if Amendment 820 did not address the issue in this appeal, it acknowledges a common truth that defense attorneys should be able to perform their job without fear of reprisal.

## **Government's argument: Green also did not fully accept responsibility by minimizing her knowledge during the plea colloquy. (Br. of Appellee at 51-54)**

The government initially repeats its prior argument (Br. of Appellee at 51), so Green relies on the preceding discussion. She focuses this discussion on the government's allegations of "false plea hearing statements." Green quotes from the plea colloquy at pages 16-20 and 36-37 of her principal brief. The relevant transcript pages span PageID#619-629. Here is a brief reproduction of that colloquy.

As part of the factual basis, the trial prosecutor recited that

On or about April 24th, 2022, Amanda Hovenac and Anthony Theodorou did knowingly and intentionally distribute a controlled substance to T.H. that resulted in T.H.'s death.

(TR 10/17/23, R66 at 34, Page ID#619) When the judge asked Green if she did what the prosecutor said she did, Green replied, "The knowingly . . . I said that I'm questioning the 'knowingly,' like that there was – *I forgot how you started*." (*Id*. at 35, Page ID#620)(emphasis added) Green said, "I don't know what they did" and affirmed that she knew that they killed T.H. "after the fact," although she "just [didn't] know how." (*Id*.) She admitted against that she knew after the fact that Amanda and Theodorou killed T.H. (*Id*. at 36, Page ID#621)

After a recess, defense counsel made a few remarks, but Green

herself explained her concern:

> THE COURT: . . . you knew they killed T.H., I'm thinking, in the
> driveway there; right? I mean you knew that it had happened,
> correct?
>
> THE DEFENDANT: I know. Yes, I do.
>
> THE COURT: All right. And they did it with some kind of drug
> that they imported.
>
> You knew that also, correct?
>
> DEFENDANT: *After the fact.*

(*Id.* at 42, Page ID#627)(emphasis added)

To be read fairly, Green's plea colloquy has two relevant parts:

The first where she asks about "knowingly" and the second where she

clarifies that she knew only *after the fact* that Hovanec and Theodorou

used an *imported controlled substance* to kill T.H.

Green's clarification is important. Green told investigators in her

preindictment interviews that Amanda described the substance as

"poison"; Theodorou testified at sentencing that Amanda referred to

using poison; and Amanda told investigators in an early interview that

she did not know what she injected into T.H., referring to it as a

11

"poison" or a "drug." (Interview 4/27/22, R104-5 at 97-98, Page ID#1459-60; Interview 4/28/22, R104-7 at 9-10, 21-22, 27, Page ID#1479-80, 1491-92, 1497; TR 10/1/24, R160 at 93, Page ID#3350; PSR at 6, ¶15)

When these two parts are read in tandem, Green affirmed that she knew Amanda and Theodorou killed T.H., but she only knew after the fact that "they did it with some kind of drug they imported." This explains why Green asked for a clarification about the judge's use of "knowingly" in the factual basis – that Amanda and Theodorou knowingly distributed a controlled substance to T.H. that resulted in his death. The "how" goes to whether Green knew beforehand that Amanda and Theodorou used a controlled substance to accomplish T.H.'s death.

The government's supplemental sentencing memorandum cites only the first part of the exchange. (Govt's Supp. Sent'g Mem., R125 at 4-5, Page ID#2492-93)(Sealed) It omits Green's personal explanation that she knew it was a controlled substance "after the fact." At Green's sentencing, the district court cataloged "the record for sentencing," which included sentencing memoranda but not the Rule 11 transcript itself. (TR 10/1/24, R160 at 4, Page ID#3261) No one – neither the

government, the judge, nor defense counsel – raised the second part of the colloquy.

The government's brief does not refute Green's explanation that she knew it was a controlled substance only after the fact. Instead, it focuses on comments about a "syringe" Green made in a preindictment interview. (Interview 4/28/22, R104-7 at 10, 21-22, 27, Page ID#1480, 1491-92, 1497) In the first mention, Green says "She never said it was a syringe," but the officer insists that Green "said earlier she mentioned she had a syringe in her pocket. . . ." (*Id.* at Page ID#1480)[4]  Green allowed that Amanda "had something. . . in her pocket" and told Green that a towel in the house "had poison." (*Id.*)

In the second mention, this exchange occurred:

[TFO Keller]: Did she tell you how she did then, did she tell you she used drugs, did she tell you she used a syringe?

[Green]: She told me poison, she didn't tell me . . . ."

[TFO Keller]: Before or after, after, after he was dead you knew she had told you that she had poisoned him."

[Green]: She said that she had had the poison umm, I mean that she used was the term poison, I'm I'm assuming because when I touched the towels she said it's in a syringe umm that, that's

_____

[4] A word search of the entire sealed record provided to counsel shows that this was the first mention of "syringe"; if an earlier one occurred, counsel did not find it in the interview transcripts.

probably what she had here in her pocket, you know right before he came . . . .

(*Id*. at Page ID#1491-92)

In the third and final mention, this exchange occurred:

[TFO Keller]: But you knew she had the poison. . . she had mentioned the poison before that, so you knew that . . . rushing the kids in.

[Green]: From him driving in, it was right there waiting, I mean it was as we were going and he is arriving umm that that's moment where you poison, I can remember saying poison, and then I'm like well she can't, in my head, I'm thinking she cannot poison him, he's not going to drink anything.

*****

[Green]: Then when she said syringe, I, the kids are there . . it its that fast.

(*Id*. at Page ID#1497)

The government admits that these were all pre-indictment

statements. (Br. of Appellee at 53) Green, through counsel, did not

object to the PSR's reference to the use of a syringe. (PSR at 5-6, ¶¶12,

15) The district court never asked Green about the delivery method of

the "poison" at the plea colloquy. The "how they did it" was with

etorophine – not poison.

14

The government cites *United States v. Trevino*, 7 F.4th 414, 432 (6th Cir. 2021), for the proposition that "even where a defendant does admit substantial elements of the crime charged, a reduction is not appropriate if the defendant contests even one factual element of the offense." (Br. of Appellee at 53)(cleaned up) The *Trevino* defendant went to trial, testified, and "contested facts essential to the charges against him," like the number of marijuana plants attributable to him. *Id.* at 432; *see generally* U.S.S.G. §3E1.1, comment. (n. 2)(noting reduction generally does not apply to a defendant who goes to trial). The district court found that Trevino's "evasive" answers at trial and his "attitude of 'defiance' toward federal law" was inconsistent with an acceptance of responsibility. *Id.* The Court affirmed. *Id.*

This is not the situation here. Green called it "poison." She said in preindictment interviews that Amanda had a syringe. Amanda and Theodorou described the contents of that syringe as "poison." Green admitted in the PSR that Amanda used a syringe to inject the poison. The "how" in the plea colloquy went to Green's statement that she knew only after the fact that the deadly substance was a controlled substance, which is consistent with Theodorou's testimony at sentencing. The

15

notion of that the delivery method of the controlled substance is a "factual element of the offense" – the language used in *Trevino* – seems a stretch. The fact that the "syringe" statements occurred only in preindictment interviews is important, as will be discussed next.

### **Government's argument: Sentencing courts may consider defendants' pre-indictment admissions to federal investigators in considering whether they have consistently accepted responsibility. (Br. of Appellee at 54-58)**

At pages 32 to 35 of her principal brief, Green relies on *United States v. Jeter*, 191 F.3d 637, 639 (6th Cir. 1999), as refined by *United States v. Tilford*, 224 F.3d 865, 868 (6th Cir. 2000), for the proposition that "it is the period following the entry of Tilford's guilty pleas, not the period following the 1993 IRS interview, that is relevant for purposes of evaluating Tilford's acceptance of responsibility." (Br. of Appellant at 34, *citing Tilford*, 224 F.3d at 868). Green cited another case – *United States v. Rodgers*, 278 F.3d 599, 601 (6th Cir. 2002) – that had been remanded for consideration of *Jeter*, which "held that the relevant time period for acceptance of responsibility does not begin until the date that federal authorities indict the defendant and he becomes aware that he is subject to federal investigation and prosecution." (Br. of Appellant at 34-35)

16

Green mentioned *United States v. Hakley*, 101 Fed. Appx. 122, 128 (6th Cir. 2004), only in passing. (Br. of Appellant 34) It is worth an extended discussion. *Hakley* confronted the issue of "whether conduct occurring before a defendant pleads guilty should be used to deny the acceptance of responsibility adjustment," which required consideration of the "temporal scope" of the conduct inconsistent with acceptance of responsibility. *Id*. at 127; *see also* U.S.S.G. §3E1.1, comment. (n. 3). *Hakley* cited the "binding precedent" in *Rodgers* that "'. . . the relevant time period for acceptance of responsibility does not begin until the date that federal authorities *indict* the defendant *and* he becomes aware that he is subject to federal investigation and prosecution." *Hakley*, 101 Fed. Appx. at 130 (emphasis in original), *citing Rodgers*, 278 F.3d at 601. In vacating and remanding the case for resentencing, this Court observed

> Ultimately, district courts are bound to follow *Jeter* and its progeny. . . However, the district court in the matter *sub judice* did not apply this precedent. Instead, the court assumed that it could focus almost exclusively on events on or before March 2002, well before Hakley pled guilty. Yet, Defendant Hakley did not enter a guilty plea until July 16, 2002 – four months later. Defendant Hakley's January 8, 2002 confession to a state law enforcement official did not put Defendant on notice that federal authorities were interested in her affairs. First, it is undisputed that Defendant Hakley's January 8, 2002 confession was to a state and not a federal officer. . . Second, the record also indicated that the officer did not place Hakley under arrest during this initial

17

interview. Third, *Jeter* and its progeny indicate that acceptance of responsibility generally does not occur until entry of a plea, which did not occur until July 16, 2002.

*Id.* at 132. Since "*Jeter* and its progeny emphasize the importance of the entry of the guilty plea and the point of indictment as the relevant time frame for notice and acceptance of responsibility," controlling precedent meant that the "district court erred by relying almost exclusively on events occurring at least four months prior to Defendant's entry of her guilty plea." *Id.*

The government attempts to distinguish these cases by asserting

. . .Green's pre-indictment <u>admissions</u> to federal agents during their investigation into T.H.'s whereabouts present similar circumstances to <u>Childers</u> . . . Green was on notice she was subject to a federal investigation and potential prosecution when she made the pre-indictment syringe admission to two FBI agents who interviewed her about T.H., a missing State Department employee whose work concerned national security issues. . . .

(Br. of Appellee at 56)(emphasis in original) The government thus claims that Green, an uncounseled layperson, knew or should have known that she was subject to a federal investigation and federal indictment.

This is a factual misstatement belied by the sentencing and interview transcripts. FBI Agent Eilermann began his testimony by stating his involving began when the local police department contacted him about a missing person (T.H.), so the FBI coordinated with the Auglaize County Sheriff's Office on a joint missing persons investigation. (TR 10/1/24, R160 at 132, Page ID#3389) Interviews occurred at Green's house and sheriff's office. (*Id*. at 134-35, Page ID#3391-92, 3394) A sheriff's detective conducted the first interview with Green. (4/27/22 Interview, R104-2 at 1, Page ID#1211) The chief sheriff's deputy sat in with two FBI agents on the second April 27 interview, and the FBI agents stress, "We're assisting, okay? We're *just assisting with the investigation. . . .*" (4/27/22 Interview, R104-4 at 3, 6, Page ID#1228, 1231)(emphasis added) When that interview is moved from Green's house to the sheriff's office, a local Detective asks a number of questions. (4/27/22 Interview, R104-5 at 57-61, 69-70, 79, 98-99, 103-106, Page ID#1419-23, 1431-32, 1441-54, 1460-61, 1465-68) The April 28 interview ends when Agent Eilerman and a task force officer leave the room, and an unknown male (presumably a sheriff's deputy from the context) tells Green that "this is where I walk you to the jail

19

and you'll be charged with aggravated murder. . . ." (4/28/22 Interview,
R104-7 at 32, Page ID#1502) Green's *federal* arrest occurred four days
later. *See* Dkt entry 5/2/22 (noting arrest of Anita Green on 5/2/22)[5]

The government's suggestion that Green knew she was facing
federal indictment during preindictment interviews is factually
incorrect and likely irrelevant as a legal matter. Yet the government
and district court relied on Green's preindictment interviews at
sentencing – specifically Green's interviews on April 27, 2022, and April
28, 2022. (TR 10/1/24, R160 at 132-43, 188-90, Page ID#3389-3400,
3445-47) The date of the indictment is May 25, 2022. (Indictment, R11
at 1, Page ID#85)

The government refers repeatedly to the fact that this is a plain
error case. Defense counsel did not raise at sentencing the second
portion of the plea colloquy and did not raise the issue that Green made

---

[5] Despite the government's suggestion to the contrary (Br. of Appellee at
57-58), Green did not challenge at sentencing or on appeal whether
Agent Eilerman could testify about her statements at her preindictment
interviews. The government incorrectly states that Eilerman was "not
present during [] those interviews." (*Id*. at 57) Eilerman, who was
present at the April 28 interview, conducted most of the questioning.
(4/28/22 Interview, R104-7 at 1-32, Page ID#1471-1502)

these statements preindictment. No one sought to rely on the PSR objections made by counsel. Plain error review involves a four-part test: 1) error 2) that is plain (i.e., clear and obvious under the law), 3) that affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-36 (1993); *see generally* Fed. R. Crim. P. 52(b). "In the ordinary case, the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 145 (2018).

Green has identified binding precedent to the effect that the acceptance of responsibility inquiry looks to the point of indictment and the entry of a guilty plea (*Jeter*) and that a district court must specifically find that the defendant falsely denied or frivolously contested the facts (*Mukes*). *See United States v. Al-Maliki*, 787 F.3d 784, 794 (6ᵗʰ Cir. 2015)(describing error as plain when it is clear under "binding case law").

As for the reliance on the plea colloquy, the Court reviews for plain error the procedural reasonableness of a sentence, which includes

whether a district court relied on clearly erroneous facts. *E.g., United States v. Lopez Paniagua*, 828 Fed. Appx. 307, 309-10 (6th Cir. 2020). The government's argument about Green's plea colloquy does not dispute that Green clarified that she knew it was a controlled substance only after the fact; instead, the government attacks the issue of the syringe. (Br. of Appellee at 51-54) The syringe became an issue at sentencing only because the district court relied on Green's preindictment statements. (TR 10/1/24, R160 at 188, Page ID#3445)("I found words coming out of Ms. Green's own mouth during the recorded interview about knowing about poison and not syringes and then syringes").

Denying Green an acceptance of responsibility raised her guidelines range from 70 to 87 months to 97 to 121 months. (*Id*. at 90, Page ID#3447; *see generally* U.S.S.G. Ch. 5, Pt. A (Sent'g Table)) A guidelines error that results in a higher range usually satisfies the third prong. *Rosales-Mireles*, 585 U.S. at 139. This is an "ordinary case," so *Rosales-Mireles* counsels that the fourth prong is met, too. *Id*. at 145.

For these reasons, the Court should vacate and remand this case for resentencing.

## The restitution appeal

The district court awarded restitution to T.H.'s minor children for psychological counseling, but the governing statute allows an award of these types of damages only to victims who suffered "bodily injury." The minor children suffered no bodily injury. The government contends that the minor children did, but it reaches this conclusion only through a misreading of the facts. Finally, the government contends – without citation to any authority – that T.H.'s bodily injury "arguably" supports an award in this case.

## Government's argument: Section 3663(b)(2)(A)'s "bodily injury" provision includes psychological harm the defendant caused a victim. (Br. of Appellee at 60-65)

A restitution order may require that a defendant

(b)(2) in the case of an offense resulting in bodily injury to a victim. . .

(A)    pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment. . . .

18 U.S.C. §3663(b)(2)(A); *accord* 18 U.S.C. §3663A(b)(2)(A); *see also* 18 U.S.C. §3663(a)(2) (defining "victim" as "a person directly and

proximately harmed a result of the commission of an offense for which restitution may be ordered. . . .").

Every circuit to have considered this issue on preserved error review has held that §3663(b)(2)(A) and its analog in §3663A(b)(2)(A) do not provide for restitution to a victim absent bodily injury.[6] *United States v. Reichow*, 416 F.3d 802, 806 (8th Cir. 2005)(citing "plain language" of statute and refusing to award restitution to bank tellers for psychological counseling since they did suffered no bodily injury); *United States v. Powell,* 42 Fed. Appx. 565, 573 (4th Cir. 2002)(stating that government had conceded error, which was appropriate since "restitution orders can only cover psychological care when there has been a bodily injury"); *United States v. Hicks*, 997 F.2d 594, 601 (9th Cir. 1993)(finding under §3663(b)(2)(A) that the "cost of psychological counseling can be included in a restitution order only when the victim

---

[6] The two circuit cases that support the government's position – *United States v. Breshers,* 684 F.3d 699 (7th Cir. 2012), and *United States v. Dotson*, 242 F.3d 391, 2000 WL 1820375 (Table)(10th Cir. 2000) – were decided on plain error review. (Br. of Appellee at 60-61) The district court relied on these cases in its restitution order. (Restitution Order, R161 at 2-3, Page ID#3486-87) Green discussed those cases at length in her principal brief and relies on that discussion here. (Br. of Appellant at 54-56)

has suffered physical injury," but no victim suffered physical injury in that case).

The Ninth Circuit further compared §3663(b)(2)(A) and §3663A(b)(2)(A) to 18 U.S.C. §2248, which provides for mandatory restitution in sexual abuse cases. *See United States v. Follet*, 269 F.3d 996, 1001 (9th Cir. 2001)(addressing issue of §2248 restitution for free psychological services provided to victim of sexual abuse). *Follet* noted that the former statutes were broader than §2248 in some respects but narrower in another: These sections permitted "restitution orders [to] cover psychological care only when there has been a bodily injury, . . . while restitution orders under §2248 are subject to no such limitation." *Id*. Unless the Court chose to "attribute to Congress extreme carelessness in choosing very different language in closely related provisions," it was "constrained to conclude that the difference was intentional." *Id*. Indeed, "§2248 was extensively amended in 1996, by the same legislation that added §3663A and extensively amended §3663." *Id.* & n. 2.

Cases addressing §3663(b)(2)(C) counsel the same result.

A restitution order may require that a defendant

(b)(2) in the case of an offense resulting in bodily injury to a victim. . .

 (C) reimburse the victim for income lost by such victim as a result of the offense . . .

18 U.S.C. §3663(b)(2)(C); *accord* 18 U.S.C. §3663A(b)(2)(C).

Analyzing this subsection, circuits – including a panel of this Court in an opinion not selected for publication – have uniformly held that only a victim suffering bodily injury may receive a restitution award for lost income. *See United States v. Patton*, 651 Fed. Appx. 423, 426-27 (6th Cir. 2016)(finding that the statute plainly covers lost wages for the person who suffered bodily injury, but as other circuits have held, "forecloses lost-wages reimbursement for family members who suffered no bodily injury"); *United States v. Wilcox*, 487 F.3d 1163, 1176-766 (8th Cir. 2007)(reasoning that "*the* victim" necessarily referred to the "victim who suffered bodily injury," so the victim's mother could not recover lost wages since she suffered no bodily injury); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991)(noting in case involving bombing of coal mine that miners could not receive restitution for lost income because "[t]here were no bodily injuries").

The government asserts that §3663(b)(2)(C)'s limitation on "income lost by such victim" makes those cases inapposite to §366(b)(2)(A) cases, since the latter statute lacks that limitation. (Br. of Appellee at 64) It further contends that the lack of this limitation means that §3663(b)(2)(A) "permits restitution for any victims of the same bodily-injury offense who suffered different forms of harm." (*Id.*) Thus, the government reasons, the minor victims can receive a restitution award for psychological counseling based on their father's bodily injury.

This view contradicts the plain statutory language. And it does not grapple with how courts address §3663(b)(4), which allows a restitution order

> in any case, [to] reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

18 U.S.C. §3663(b)(4); *see also* 18 U.S.C. §3553A(b)(4). Even without the qualifier of "such victim" on the award of listed expenses as in §3663(b)(2)(C),[7] courts have held that the representative of a victim

---

[7] In other words, §3663(b)(4) does not say "in any case, [to] reimburse the victim for lost income and necessary child care, transportation, and

under §3663A(a)(2) cannot receive reimbursement for her own losses: The statute "specifically limits restitution to reimbursement of the victim's covered losses." *United States v. Casados*, 26 F.4th 845, 851 (10th Cir. 2022)(relying on *Wilcox* and *Patton* to reach this conclusion; *accord United States v. Acevedo-Osorio,* 118 F.4th 117, 141 (1st Cir. 2024); *see also* 18 U.S.C. §3663(a)(2) (providing for representative of a victim). The existence of "such victim" in §3663(b)(2)(C) but not §3663(b)(2)(A) is of no moment.

**Government's argument: Green nevertheless caused T.H.'s daughters to suffer bodily injury – including physical harm – thus entitling them to restitution under Section 3663(b)(2)(A). (Br. of Appellee at 65-67)**

For the first time on appeal, the government makes the purely factual argument[8] that T.H.'s daughters suffered "'physical reactions'" justifying a restitution award:

---

other expenses *of such victim*"; the italicized language would thus track §3663(b)(2)(C).

[8] The government's brief relies on the victim statement, which is part of what the district court considered at sentencing. It points to Green's sentencing transcript thrice. (Br. of Appellee at 65-66) The remaining eight transcript citations refer to the transcript of Amanda's sentencing. (Br. of Appellee at 65-67) The district court carefully listed, without objection from either side, what it considered to be the sentencing

> A.S. outlined those physical manifestations in her sealed statement for Green's sentencing, noting that the children had abdominal pain, headaches, and exacerbated medical conditions. (R108-1: Sealed Victim Statement, PageID 1725)

(Br. of Appellee at 67) According to the government, these "facts"

support the district court's restitution order. (*Id.*)

The government once again misapprehends those "facts." Here is

what the cited portion of victim statement says:

> During their 16 months with us, the girls suffered from various physical ailments including abdominal pain, headaches, sleeplessness due to anxiety and nightmares, increased fear of snakes and spiders, especially poisonous ones, exacerbation of asthma and development of food allergies and sensitivities.
>
> Some of these maladies were directly related to the stress of the horrific events and the loss of their parents, e.g.[9] the sleeplessness and nightmares. Some *may or may not* be the direct result of these events, but the underlying and ongoing stress continues to have an immeasurable impact on [T.H.'s] daughters. . . .

(Victim Impact Statement, R108-1 at 172, Page ID#1725)(Sealed)

(emphasis added)

---

record. (TR 10/1/24, R160 at 4-7, Page ID#3261-64) That list did not include anything from Amanda's sentencing hearing.

[9] "E.g.," from the Latin *exempli gratia*, means "[f]or example." Black's Law Dictionary, e.g., (12th ed. 2024).

The statement draws a direct relationship between the stress of T.H.'s death and his daughters' sleeplessness and nightmares. The statements does not attribute other "physical ailments" – including the "abdominal pain, headaches, and exacerbated medical conditions" cited by the government – to T.H.'s death, saying only that they "may or may not" from that event.

The government did not raise this argument in district court, where it had the burden of proving loss for restitution awards by a preponderance of the evidence. *See United States v. Fike*, 140 F.4th 351, 357 (6th Cir. 2025). This would have been a factual issue. While a district court does not have to make specific factual findings in awarding restitution, "'the information underlying an award must have sufficient indicia of reliability to support its probable accuracy.'" *Id.* (cit. omitted). With respect to the "physical manifestations" upon which the government now relies, the victim statement does not meet the government's burden or present sufficiently reliable information to support the accuracy of an award.

**Government's argument: Section 3663(b)(2)(A) does not require "a victim" who suffered bodily injury to be the same victim receiving psychological care. (Br. of Appellee at 67-68)**

In district court, the government identified the victims as T.H. and his minor children; asserted that Amanda and Theodorou were liable for restitution to T.H.'s estate because the administration of etorphine caused his death; and argued that Green's "participation in the cover-up" led to restitution liability only for psychological harm to the minors. (Govt's Br. on Restitution, R106 at 4, 7, 16-17, Page ID#1508, 1511, 1520-21)

Although the restitution order came three months after sentencing, the trial prosecutor never relied on Theodorou's testimony to assert that Green "*arguably* helped commit gross abuse of T.H.'s corpse" under state law, which meant that she caused physical injury to T.H. (Br. of Appellee at 67-68) The government then repeats its earlier argument that §3663(b)(2)(A) allows compensation to any victim for the bodily injury of another victim. (Br. of Appellee at 68).

31

The government cites no authority for this proposition, either now or in its previous argument, and the repeated argument ignores the plain statutory language.

## CONCLUSION

For these reasons, the Court should vacate and remand Green's sentence.

Respectfully submitted this 29th day of August, 2025.

<u>s/ Amy Lee Copeland</u>
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,413 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

This 29th day of August, 2025.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

# CERTIFICATE OF SERVICE

I served a copy of this Reply Brief on counsel for the government by filing it on the Court's EC/CMF portal, which emails to all counsel of record a link to a file-stamped .pdf copy of the brief.

This 29th day of August, 2025.

/s/ Amy Lee Copeland
Amy Lee Copeland
Georgia Bar No. 186730
Attorney for Appellant

602 Montgomery Street
Savannah, Georgia 31401
912-807-5000
ALC@roco.pro

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Indictment, R11................................................................Page ID#85

Plea Transcript (10/17/23), R66......................................Page ID#619-29

Transcript of 4/27/22 Interview, R104-2..........................Page ID#1211

Transcript of 4/27/22 Interview, R104-4.............. Page ID#1228, 1231

Transcript of 4/27/22 Interview, R104-5................... Page ID#1459-60

Transcript of 4/28/22 Interview, R104-7  ................ Page ID#1419-23, 1431-32, 1441-54, 1465-68, 1471-1502

Govt's Br. on Restitution, R106............ Page ID#1508, 1511, 1520-21

Victim Impact Statement, R108-1 (Sealed) ....................Page ID#1725

Govt's Supp. Sent'g Mem., R125 (Sealed) .......................Page ID#2489, 2492-93

Sentencing Transcript (10/1/24), R160  ............. Page ID#3261, 3279, 3350, 3389-3400, 3445-47

Restitution Order, R161 .................................................. Page ID#3486-87

Presentence Investigation Report (Sealed)............ Pages 5-7, 19-23, 24-25, 50-56